## S00A1798, S00X1800. HEAD v. CARR; and vice versa.
(544 SE2d 409)

THOMPSON, Justice.

In 1994, a jury convicted Timothy Don Carr of malice murder, motor vehicle theft, and other offenses and sentenced him to death for the murder. This Court affirmed the convictions and death sentence, *Carr v. State*, 267 Ga. 547 (480 SE2d 583) (1997), and the United States Supreme Court denied Carr's petition for certiorari. *Carr v. Georgia*, 522 U. S. 921 (118 SC 313, 139 LE2d 242) (1997). In 1998, Carr filed a petition for writ of habeas corpus challenging his convictions and death sentence and an evidentiary hearing was held in 1999. The habeas court ruled in its final order that all of Carr's claims other than ineffective assistance of counsel were without merit. The habeas court then vacated Carr's death sentence after finding that Carr's trial counsel had been ineffective in the preparation and presentation of Carr's case. The warden appeals, Case No. S00A1798, and Carr cross-appeals, Case No. S00X1800. We reverse and reinstate Carr's death sentence.

The evidence adduced at trial showed that Carr was at a party in Macon in October 1992 with his girlfriend, Melissa Burgeson, and the 17-year-old victim, Keith Young. People at the party consumed alcohol and the juice from boiled hallucinogenic mushrooms; some also smoked marijuana. Burgeson obtained Young's car keys claiming that he was too intoxicated to drive. She and Carr discussed robbing the victim of his car; they also knew that Young had just cashed his paycheck. In the early morning hours, Burgeson, Carr, Young, and two juveniles (one male, one female) left the party in Young's car. Burgeson was driving, Young was in the front passenger seat, and the others were in the back seat. During the drive, Carr displayed a knife to one of the juveniles and whispered to her that he was going to kill Young. There was also a baseball bat in the back seat of the car. Burgeson stopped the car on a dirt road under the pretense that they were going to look for mushrooms and everyone exited except for the female juvenile. When Young was looking in the trunk, Burgeson whispered to Carr to "do it now." Carr grabbed Young from behind and cut his throat twice. Burgeson said, "that ain't enough" and Carr stabbed the victim several times in the chest. Young pleaded for his life, but Carr laughed and said "I'm going to kill you, boy." After Young had fallen to the ground, Carr rolled him over on his stomach and stabbed him several times in the lower back. The male juvenile then handed Carr the baseball bat and he beat the victim in the head, fracturing his skull. Burgeson took cash from the victim's pockets and they returned to Macon, where they dropped off the male juvenile and drove to Tennessee. In Tennessee, the police chased the victim's car and arrested Carr, Burgeson, and the female

juvenile after they crashed. *Carr*, 267 Ga. at 548 (1).

## CLAIMS THAT ARE BARRED

1. Claims that were previously litigated and decided on direct appeal are barred because "[a]fter an appellate review the same issues will not be reviewed on habeas corpus." *Elrod v. Ault*, 231 Ga. 750 (204 SE2d 176) (1974). See also *Gaither v. Gibby*, 267 Ga. 96 (2) (475 SE2d 603) (1996) (issues raised and decided on direct appeal cannot be reasserted on habeas corpus). The habeas court correctly ruled that these claims were barred from habeas corpus review because they have been raised and decided on direct appeal: the proportionality of Carr's death sentence, *Carr*, 267 Ga. at 559 (11); the admissibility of his audiotaped statement, id. at 551-552 (3); the trial court's failure to excuse for cause prospective jurors Hunnicut, Kendrick, and Bittick, id. at 553-555 (5), (6); the denial of Carr's request for a hearing on the voluntariness of his audiotaped statement, id. at 552-553 (4); and Carr's objections to the prosecutor's closing arguments, id. at 555-559 (7), (8).

## CLAIMS THAT ARE DEFAULTED

2. A habeas petitioner who fails to raise an issue that he could have raised on direct appeal defaults the issue on habeas corpus, unless he can meet the cause and prejudice test.

> [A] failure to make timely objection to *any* alleged error or deficiency or to pursue the same on appeal ordinarily will preclude review by writ of habeas corpus. However, an otherwise valid procedural bar will not preclude a habeas corpus court from considering alleged constitutional errors or deficiencies if there shall be a showing of adequate cause for failure to object or to pursue on appeal *and* a showing of actual prejudice to the accused.

*Black v. Hardin*, 255 Ga. 239 (4) (336 SE2d 754) (1985). See also OCGA § 9-14-48 (d). To show cause, Carr must demonstrate that " 'some objective factor external to the defense impeded counsel's efforts' to raise the claim that has been procedurally defaulted." *Turpin v. Todd*, 268 Ga. 820, 825 (493 SE2d 900) (1997), quoting *Murray v. Carrier*, 477 U. S. 478, 488 (106 SC 2639, 91 LE2d 397) (1986). To show prejudice, Carr must demonstrate actual prejudice that " 'worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.' " *Turpin*, supra at 828, quoting *United States v. Frady*, 456 U. S. 152, 170 (102 SC 1584, 71 LE2d 816) (1982). The only exception to the cause and prej-

udice test is the granting of habeas corpus relief to avoid a "miscarriage of justice," which is an extremely high standard. See *Valenzuela v. Newsome*, 253 Ga. 793 (4) (325 SE2d 370) (1985).

Carr raised the following claims for the first time on habeas corpus: the constitutionality of the proportionality review conducted by this Court; the trial court's alleged errors in excusing some potential jurors and in failing to strike others; the trial court's alleged restriction of voir dire; the trial court's refusal to grant a change of venue; the trial court's exclusion of some mitigation evidence; alleged violations of the Unified Appeal Procedure; alleged prosecutorial misconduct; alleged inadequate assistance by experts; the use of one jury to determine both guilt and sentence; improper guilt-innocence phase jury instructions; the constitutionality of execution by electrocution; and the constitutionality of the Unified Appeal Procedure. These claims could have been raised on direct appeal and Carr has not shown sufficient cause to explain why they were not raised. The habeas court thus correctly ruled that these claims are procedurally defaulted. *Black*, supra. We find no error with the trial court's sentencing phase jury charge.

## OTHER CLAIMS

3. The habeas court properly denied Carr state funds to pursue habeas corpus relief. *Gibson v. Turpin*, 270 Ga. 855 (1) (513 SE2d 186) (1999); *Johnson v. Zant*, 249 Ga. 812 (11) (295 SE2d 63) (1982). The evidence supports the habeas court's findings that there were no deals between the district attorney and the juvenile witnesses in exchange for their testimony and that there was no juror or prosecutorial misconduct during Carr's trial. The habeas court also correctly found that Carr's juvenile adjudication for simple battery was valid and properly admitted.

## INEFFECTIVE ASSISTANCE OF COUNSEL

4. Carr's claim of ineffective assistance of counsel is neither barred nor defaulted because this claim need not be raised until trial counsel no longer represents the defendant. *White v. Kelso*, 261 Ga. 32 (401 SE2d 733) (1991). Carr's trial counsel represented him throughout his direct appeals so their alleged ineffectiveness remains a viable claim on habeas corpus. Id. In order to prevail, Carr must show both deficient performance by trial counsel and actual prejudice. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SC 2052, 80 LE2d 674) (1984); *Smith v. Francis*, 253 Ga. 782 (1) (325 SE2d 362) (1985). To show deficient performance, he must demonstrate that trial counsel's performance was not reasonable under the circumstances confronting them before and during the trial, without

using hindsight. *Strickland*, 466 U. S. at 689-690; *Smith*, supra. Carr's burden is high because trial counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, supra at 690. To show actual prejudice, Carr must demonstrate that "there is a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Smith*, supra. See also *Strickland*, 466 U. S. at 694.

A claim of ineffective assistance of counsel is a mixed question of law and fact. *Strickland*, 466 U. S. at 698; *Lajara v. State*, 263 Ga. 438 (3) (435 SE2d 600) (1993). The proper standard of review requires that we accept the habeas court's factual findings unless clearly erroneous, but we independently apply the legal principles to the facts. *Linares v. State*, 266 Ga. 812 (2) (471 SE2d 208) (1996). The habeas court determined that trial counsel had been deficient for several reasons with resulting actual prejudice sufficient to vacate Carr's death sentence. Because the habeas court's rulings are either factually or legally unsupportable, we reverse.

A. *The guilt-innocence phase.*

The trial court did not err by ruling that the evidence of Carr's guilt was too great for him to show that actual prejudice resulted from alleged errors in the guilt-innocence phase. See *Strickland*, 466 U. S. at 697 (courts need not consider trial counsel's performance on an ineffectiveness claim if no actual prejudice can be shown from counsel's alleged errors). At trial, witnesses established that Carr, Burgeson, the victim, and the two juveniles were at the party and that they all left in the victim's car. A witness testified that they returned to the house without the victim. The two juveniles who witnessed Carr commit the murder testified for the State. Carr was arrested driving the victim's car in Tennessee; there was blood on his shoes. There was also blood on the knife found in Burgeson's purse; this knife was identified by witnesses as one of the murder weapons. The baseball bat was also recovered from where Carr had thrown it after the murder. After their arrest, Carr and Burgeson were placed in a police car and secretly audiotaped discussing the murder; this tape was admitted at trial. On the tape, Carr and Burgeson fretted that their fingerprints were on the bloody knife because, after stabbing the victim, Carr handed the knife to the male juvenile who gave it to Burgeson. Carr further boasted about beating the victim three times in the head with the bat, and they worried that the female juvenile might already be talking to the police so they would be unable to claim that Carr was defending Burgeson from the victim's attempted rape. Carr also stated that he was going to "wig out" to support a psychiatric defense and that he wished for amnesia. Carr

believed that he would probably be found guilty because the police had his shoes and the victim's blood was on them. We therefore affirm the habeas court's ruling upholding the convictions because Carr cannot show actual prejudice with regard to the jury's finding of guilt. See *Strickland*, 466 U. S. at 694; *Smith*, supra at 783 (1).

B. *Trial counsel's actions during the penalty phase.*

(1) *The investigation and trial preparation.* The habeas court found a number of deficiencies in trial counsel's performance so it is helpful to recite what actions trial counsel took in the investigation and presentation of Carr's case before we address the alleged deficiencies. The record shows that Harold Martin and Mike Dillon were appointed to represent Carr shortly after his arrest. Martin, who was lead counsel, has been an attorney since 1971 and had tried over 20 murder cases, half of them death penalty cases. Dillon, Martin's co-counsel, had graduated from law school the previous year and played only a small part in the investigation and presentation of Carr's case. He was mainly used for legal research. Martin went to the crime scene, reviewed the physical evidence and the State's file, and spoke with the police investigators. He sent Dillon to attend the juvenile hearings for the two juveniles involved in the murder. Martin believed the audiotape of Carr incriminating himself in the conversation with Burgeson was the most damaging piece of evidence against Carr and he unsuccessfully sought to suppress it. He recognized that criminal intent would be an important element of the trial and he researched the effects of hallucinogenic drugs. He also recognized that mental health might be an issue after Carr told him that he believed Burgeson was a witch who could control him. He requested a court-appointed mental health examination for Carr.

The court-appointed psychologist, Dr. Robert Storms, reported that Carr was competent to stand trial and not legally insane. Dr. Storms also reported that Carr had been seriously depressed and suicidal for some time, had been a heavy substance abuser since age 14 (Carr was 22 years old), had been intoxicated during the crimes for which he had been charged, and had been intimidated and psychologically controlled by Burgeson, who Carr believed was a witch who could control him. Carr, in fact, had a life-long history of belief in the occult and witchcraft as well as a difficult childhood.

Martin interviewed several of Carr's family members for mitigation evidence. He had Carr's mother write a narrative of Carr's life and had her solicit letters about Carr from other family members and acquaintances. He learned that Carr had been physically and sexually abused as a child, and that many members of his family, including his deceased father, were alcoholics. Carr's father had died in a car accident in 1989 shortly after Carr and he had argued and Carr had "wished him dead."

Martin sought a plea agreement to avoid the death penalty to no avail. In August 1993, he allowed Carr to give a statement to the district attorney and offered to have him testify at Burgeson's trial, which was scheduled before Carr's. The State was also seeking the death penalty for Burgeson. In the statement, Carr recounted the events of the murder, but stressed that he had been very intoxicated at the time on alcohol and hallucinogenic mushrooms and that he had been controlled by Burgeson. Carr also testified at Burgeson's trial, which Martin attended. Both times he swore that there were no promises or deals in exchange for his statement or testimony. During the pretrial statement, he acknowledged that the district attorney would continue to seek the death penalty against him and he stated that he was giving the statement because he was "not taking the fall for this all by myself."

Martin consulted with the Multi-County Public Defender's Office about death penalty strategy. After determining that he needed an independent mental health examination, he requested from the Multi-County Public Defender's Office a list of recommended psychiatrists. Martin chose Dr. James Cheatham and Dr. Cheatham examined Carr three times from December 1993 to April 1994. Dr. Cheatham diagnosed Carr as being depressed, suicidal, a substance abuser, and suffering from post hallucinogenic perception disorder. He believed that Melissa Burgeson dominated Carr by taking advantage of his superstitions and belief in the occult. He also reported that an MRI revealed a brain abnormality probably resulting from brain damage early in life.

Through Dr. Cheatham, Martin also hired Dr. Gracelyn Franco, a psychologist who evaluated Carr in January 1994, and Darien Bogenholm, a social worker with experience as a mitigation investigator. Dr. Franco diagnosed Carr with borderline personality disorder and depression. She noted that he was easily manipulated and showed some signs of an organic brain syndrome. Ms. Bogenholm had previously been a nurse specializing in child psychiatry and she had a master's degree in social work. She interviewed Carr, his mother, his wife, his uncle, his aunt, his grandmother, and his cousin. She learned from them that Carr had been a breech birth and that he had been born with a cone-shaped head. She further learned that Carr's father was an abusive alcoholic and that Carr had been sexually abused as a child by cousins and a notorious Macon-area pedophile. When he was 17 years old, Carr's girlfriend had his baby, but it was premature and died after only a day. Carr married a different woman in 1989, but then became involved with Burgeson. Carr's father also died in 1989. Ms. Bogenholm believed that Carr had post traumatic stress disorder and substance abuse problems due to his childhood.

(2) *The trial.* At the April 1994 trial, Martin decided to use a diminished capacity defense centered around Carr's intoxication on the night of the murder and his control by Burgeson. In his opening statement in the guilt-innocence phase, Martin stressed these factors as well as the fact that Carr cooperated, provided a statement, testified at his co-defendant's trial, and would testify at his trial. Carr testified in the guilt-innocence phase. He stated that his parents had divorced when he was a child and that he lived with his abusive, alcoholic father from age 13 to adulthood. He was sexually abused by acquaintances and a cousin and he became a heavy substance abuser. He related that Burgeson controlled him, and that by the time of the party he was depressed and suicidal over his broken relationship with his wife. At the party in October 1992, he drank tequila, smoked marijuana, took muscle relaxers, and drank two full ice-tea glasses of hallucinogenic mushroom juice. He was "completely out of it" and he thought he was overdosing. Burgeson schemed the robbery of the victim's car at the party. When Burgeson handed him the knife out at the dirt road and said "do it now," he initially said no, but then he cut the victim's throat because he was intoxicated and could not resist Burgeson's demands. He stated that he did not remember anything he said on the audiotape because he had continued ingesting mushrooms until his arrest and had been injured at the time of his arrest and received pain medication. He told the jury he testified for the State at Burgeson's trial. He said he did not intentionally kill the victim, and he would trade places with him if he could.

On cross-examination, he agreed with the prosecutor that he had given his August 1993 statement without any exchange of promises or deals, because he "didn't want to take the rap by myself." He also agreed that he had voluntarily ingested all the drugs and alcohol at the party. Carr's memory of the murder was fuzzy in that he could remember cutting the victim's throat, but not the stabbing or beating. Later, he said he had "flashbacks" about beating the victim with the bat. The prosecutor pointed out that his memory was selective because he could remember exactly where everyone was sitting in the car just before the murder. The prosecutor had him demonstrate the events of the murder that he could remember. Carr said he had no will to resist Burgeson's commands because he believed she was a witch who could do spells. The prosecutor brought out that at one point on the audiotape Burgeson asked him what she should say to the police as an indication that she did not control him. On re-direct, Carr stressed that he had told the truth. Martin argued in closing that Carr had testified when he did not have to and he restated the factors that allegedly diminished Carr's intent such as intoxication and Burgeson's control due to Carr's belief in witchcraft. The jury convicted Carr.

In the sentencing phase, Dr. Storms, the court-appointed psychologist, testified for the defense. He said that he had evaluated Carr numerous times and that Carr has a life-long history of depression and drug abuse. He diagnosed Carr with arterial sclerosis of the brain (an "old man's brain," probably due to heavy drug abuse); being superstitious, including a strong belief in witchcraft; being psychologically dependent on Burgeson; and being a drug and alcohol abuser. He testified that he had also conducted a court-appointed evaluation of Burgeson and found her to be very psychologically dominant. He said Carr did not have a violent background and had been intoxicated and severely depressed on the night of the murder. On cross-examination, he stated that Carr was competent, sane, and had an above-average IQ. He also admitted that much of his evaluation was based on Carr's representations to him, but he stressed that he did not rely only on Carr for information. He conceded that Carr had been adjudicated delinquent when he struck his father with a stick when he was a juvenile, and that he had a previous adult conviction for burglary.

Carr's mother testified next. She said Carr's father was an abusive alcoholic who denied that Carr was his child in Carr's presence. She stated that Carr was unsupervised when he began living with his father as a young teenager, and that Carr began heavily abusing drugs and alcohol at that time. She said that Carr was not violent, was married, and that there was hope for him. Carr's uncle also testified that Carr's father had called Carr a "little bastard," and that the worst thing for Carr's development was going to live with his abusive father. He said that he had seen Carr on the day of the murder and that Carr had seemed very depressed.

Darien Bogenholm, the mitigation specialist, testified that she was a former psychiatric nurse with a master's degree in social work who worked for Dr. Cheatham on death penalty cases and other kinds of cases. She interviewed Carr and a number of his family members using forms to structure her interviews. She reported that Carr had been born with a cone-shaped head due to a breech birth, and that this and other problems experienced by Carr's mother during pregnancy could have led to problems later in Carr's life. She stated that Carr's father was abusive and related several anecdotal incidents that described his abusive behavior. Carr had been sexually abused by cousins and two other pedophiles. She reported that the daughter Carr had with a girlfriend died in his arms just after birth, and that Carr later married another woman, but was unfaithful to his wife with Burgeson. His wife had also been unfaithful to him. Carr became very depressed after the deaths of his grandparents and father. He was a heavy substance abuser and suicidal; she also believed that he had post traumatic stress disorder due to his child-

hood. On cross-examination, she admitted that much of her testimony was based on what Carr's family had told her, and that Carr had informed her that he had committed 250 burglaries in the Macon area at Burgeson's direction.

Dr. Cheatham was the last mitigation witness. He testified that he had evaluated Carr while he had Ms. Bogenholm interview Carr's family. He recited the same findings about substance abuse, childhood abuse, and childhood sexual abuse discussed by the previous experts and Carr. He said Carr was not violent by nature and had abused many drugs. He said that Carr suffered from post hallucinogenic perception disorder on the night of the murder, which had made him susceptible to influence by others, and that Burgeson had dominated Carr. Dr. Cheatham had read the transcript of the police car audiotape and he opined that the tape was not reliable because Carr had been injured and on medication, still under the effect of hallucinogens, and trying to be macho and protective of Burgeson. Although Carr's IQ was in the normal range, he said Carr had left school in the ninth grade and that an MRI showed brain damage from trauma early in life. Carr was very depressed, with mood swings and suicidal tendencies. On cross-examination, Dr. Cheatham admitted that he had read the transcript of the audiotape, but he had never listened to the actual recording. He reiterated that Carr suffered from organic brain damage. Martin argued in closing that killing Carr would not serve as a deterrent and that Carr was brain-damaged and remorseful. The jury recommended the death penalty.

C. *The habeas court's findings of trial counsel ineffectiveness.*

The habeas court found a number of areas where trial counsel's performance was deficient to support the vacation of Carr's death sentence. These findings are either factually unsupportable or legally insufficient to demonstrate actual prejudice.

(1) *Trial counsel's advice to Carr to confess before trial.* Notwithstanding the written and oral disclaimers of the existence of any deal between the State and Carr for his pretrial statement, Martin testified that there was an implicit deal with the State in exchange for Carr's cooperation. Martin claimed the district attorney offered to "help" Carr if he gave a statement and testified at Burgeson's trial; Martin said he understood the "help" to be a plea for a life sentence even though the district attorney did not use these words. Martin said this is why he advised Carr to give the statement and testify against Burgeson. The district attorney then allegedly reneged on the "deal" and Carr's case went to trial. The district attorney testified at the habeas evidentiary hearing that there was no deal, but that sometimes Martin tries to "nice" prosecutors into deals for his clients. The habeas court found that there was no actual deal for Carr's statement, but that trial counsel was deficient for advising Carr to confess

and for failing to memorialize the deal in writing if Martin believed that one existed.

We need not address the possible motives for Carr's pretrial statement since this issue can be resolved by an analysis of whether there is actual prejudice resulting from his statement. See *Strickland*, 466 U. S. at 697. Martin stated at the habeas hearing that Carr testified at his trial because he believed that the district attorney would introduce the pretrial statement into evidence if he did not testify; the statement itself was not presented at trial. The record further shows that Carr's trial testimony was very similar with and consistent to his pretrial statement. The habeas court has also determined that none of trial counsel's alleged deficiencies would have reasonably changed the result of the guilt-innocence phase. The question thus devolves into whether the information in Carr's testimony reasonably changed the result of the sentencing phase from life to death. We hold that it did not.

Carr's pretrial statement and resulting trial testimony did not create a reasonable probability that his sentence would have been different if he did not testify. See *Smith*, 253 Ga. at 783-784. Simply put, Carr's testimony did not hurt his case. At trial, Carr's description of the events of the murder was similar to the testimony of the two juvenile witnesses who testified for the State. His testimony was also not the only time the jury heard him incriminate himself since the audiotape of his discussion with Burgeson was admitted at trial. With regard to the murder, Carr's testimony essentially only added evidence of his high level of intoxication and of his control by Burgeson, the two main elements of his diminished capacity defense. He also expressed sympathy for the victim and remorse for the murder, both of which had been absent on the audiotape. He further testified about his difficult childhood and the physical and sexual abuse he had endured. Martin used Carr's testimony to argue that Burgeson was more culpable and he reminded the jury that Carr had cooperated with the State and testified at his trial when he did not have to do so. Therefore, regardless of Martin's reasons for allowing or recommending the pretrial statement, we conclude that Carr's mitigation case was not harmed by it or his resulting trial testimony. Id.

(2) *Trial counsel's performance during voir dire.* The habeas court found that trial counsel's performance during voir dire was deficient because trial counsel did not move to strike several jurors allegedly predisposed to a death sentence. The habeas court also found that trial counsel failed to pose reverse-*Witherspoon* questions to every prospective juror. See *Morgan v. Illinois*, 504 U. S. 719, 729 (112 SC 2222, 119 LE2d 492) (1992) (reverse-*Witherspoon* questions are designed to determine if a prospective juror is disqualified because he or she would always impose death upon a finding of guilt);

*Wainwright v. Witt*, 469 U. S. 412, 424 (105 SC 844, 83 LE2d 841) (1985). We conclude that trial counsel's performance was not deficient with regard to the conduct of voir dire, and that, even if deficient, Carr has failed to demonstrate actual prejudice.

Martin testified at the habeas hearing that he is experienced at conducting voir dire in death penalty cases. The record shows that he received updated information about striking juries in death penalty cases from the Multi-County Public Defender's office before Carr's trial. It is also apparent from the trial record that Martin and Dillon personally knew some of the prospective jurors from living and practicing in the area. The habeas court specifically found that trial counsel was ineffective for failing to move to strike prospective jurors Cohen, Wright, Adams, Ham, Brinkley, Dumas, and Tarum who, according to the habeas court, "indicated that they would not consider a life sentence if petitioner was found guilty of murder." The trial record shows that prospective jurors Adams, Ham, Brinkley, Dumas, and Tarum, although equivocal at times, could vote to impose a life sentence and were qualified to serve on Carr's jury. See *Mize v. State*, 269 Ga. 646 (6) (d) (501 SE2d 219) (1998) (a prospective juror is not disqualified for leaning for or against a death sentence); *Greene v. State*, 268 Ga. 47, 48-50 (485 SE2d 741) (1997). Based on their responses, the trial court was not required to excuse them for cause, id.; therefore, trial counsel could not have been deficient for not moving to strike them. The qualification of prospective jurors Cohen and Wright is more difficult to ascertain. Both stated at the beginning of their voir dire questioning that they could consider life or death as possible sentences, but they later indicated that they would vote for the death penalty if Carr was guilty of murder. See *Williams v. State*, 258 Ga. 281, 288 (368 SE2d 742) (1988); *Pope v. State*, 256 Ga. 195 (7) (e) (345 SE2d 831) (1986), overruled on other grounds by *Nash v. State*, 271 Ga. 281 (519 SE2d 893) (1999). By their nature, trial counsel's conduct of voir dire and the decision on whether to interpose challenges are matters of trial tactics. See *Hammond v. State*, 264 Ga. 879 (7) (b) (452 SE2d 745) (1995); *Williams*, supra at 289. This is underscored by the internal debate between Martin and Dillon revealed by Dillon's notes and affidavit, in which Martin resisted striking these jurors despite Dillon's insistence that they move to excuse them. Although Carr bears the burden of showing deficient performance by trial counsel, he never asked Martin at the habeas evidentiary hearing why he wanted to avoid striking these jurors for cause. See *Hammond*, supra. There could have been other reasons for retaining them; we note that prospective jurors Cohen and Wright also stated that they believed that people who are intoxicated sometimes say things that are not true, which was one of Carr's arguments against the reliability of his audiotaped statement.

However, we need not resolve whether trial counsel was deficient for failing to challenge prospective jurors Cohen and Wright for cause because Carr has failed to meet his burden of showing actual prejudice. *Smith*, supra. The habeas court, in finding prejudice, incorrectly utilized the presumption of prejudice to a defendant that arises when this issue is preserved at trial and enumerated as error on direct appeal. See *Frady*, 456 U. S. at 166; *Todd*, 268 Ga. at 828; *Pope*, supra. As previously mentioned, the actual prejudice showing required to prove a claim of ineffective assistance of counsel is whether there is "a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Smith*, supra at 783. We do not need to remand this issue to the habeas court for a finding under this standard; there is no such reasonable probability of a different sentencing outcome in Carr's case had trial counsel successfully challenged these two prospective jurors for cause. See *Frady*, supra at 169-174 (if incorrect prejudice standard applied by lower court, appellate court can determine existence of actual prejudice from trial record). Compare *Todd*, supra. The record shows that Carr's counsel eventually used peremptory challenges to remove prospective jurors Wright and Cohen; obviously, neither played any role in the sentencing determination. Further, Carr still had one unused peremptory challenge remaining when the jury was seated and an analysis of the voir dire responses of the several prospective jurors at the end of the panel does not show any that were clearly favorably inclined to Carr's case. Moreover, Carr's sentencing jury recommended a death sentence after only 90 minutes of deliberation and they sent no notes to the trial court indicating difficulty in reaching a decision. We conclude that, even if trial counsel was deficient for failing to strike prospective jurors Wright and Cohen for cause, Carr cannot show actual prejudice from his resulting inability to use two additional peremptory challenges. Similarly, any alleged prejudice resulting from trial counsel's failure to pose reverse-*Witherspoon* questions to every prospective juror is too speculative to support a finding of ineffective assistance of counsel.

(3) *Trial counsel's alleged failure to present mitigating evidence.* The habeas court found that trial counsel was ineffective for failing to present "a significant amount of mitigating information about petitioner's life history and the circumstances of the crime," including "details of petitioner's extremely difficult childhood, evidence of physical and sexual abuse suffered by petitioner at the hands of his father, the history of alcoholism and mental illness in his family, evidence of a brain injury suffered at petitioner's birth, as well as good character evidence." We hold that the habeas court's findings are either clearly erroneous factually or legally insufficient to show inef-

fective assistance of counsel.

The habeas court faulted trial counsel for failing "to elicit a fraction of the mitigation evidence [Carr's mother] was prepared to present at the sentencing phase of the trial." Mrs. Carr provided an affidavit on habeas corpus stating that she was willing to testify to much more than she did at trial and that Martin did not allow her to ask for mercy for her son. The record shows that Martin spoke with Mrs. Carr on several occasions before trial and that he had her write a narrative detailing Carr's life history. Darien Bogenholm, the mitigation investigator, also interviewed her. At trial, Mrs. Carr testified that Carr's father had denied paternity of Carr in Carr's presence when he was a child, that Carr's father was an alcoholic who had exercised little supervision of Carr, that Carr's father taught Carr not to cry or show emotion, and that Carr had been upset when his father died in 1989 but had only cried a little. She had tried to get help to end Carr's drug problem when he was a teenager, but she had failed. She further stated that Carr was married, not violent, and that there was hope for him. When she was preparing to leave the stand (the State declined to cross-examine her), she asked the judge, "Could I say one more thing?" The trial court told her she would have to talk to Carr's counsel; thereafter, she did not return to the stand. Mrs. Carr claims in her habeas affidavit that she would have testified more extensively about the mitigating information contained in the narrative she provided to Martin before trial, and that she wanted to ask the jury for mercy for her son but Martin did not allow her to return to the stand. The habeas court found the information in Mrs. Carr's affidavit "compelling" and that there was a reasonable probability the jury would have recommended a life sentence if it had been presented to them.

Neither the finding of deficient performance nor the finding of actual prejudice is legally supportable. When determining deficient performance, " 'we address not what is prudent or appropriate, but only what is constitutionally compelled.' " *Zant v. Moon*, 264 Ga. 93 (2) (440 SE2d 657) (1994), quoting *Burger v. Kemp*, 483 U. S. 776, 780 (107 SC 3114, 97 LE2d 638) (1987). The appropriate test for whether Carr's counsel was deficient is "whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. [Cits.]" (Punctuation omitted.) *Turpin v. Mobley*, 269 Ga. 635, 644 (502 SE2d 458) (1998). Perfection is not required; an ineffectiveness analysis is simply intended to ensure that the adversarial process at trial worked adequately. Id. We understand that post-conviction counsel will almost always be able to identify some potential mitigating evidence not presented to the jury and that this alone does not render trial counsel's performance deficient. Id. at 641. From Mrs. Carr, trial counsel elicited evidence of Carr's abusive

father, unsupervised adolescence, nonviolent nature, and hope for him. Although other lawyers might have elicited more from her, this alone does not support a finding of deficient performance; the extent of trial counsel's questioning of Mrs. Carr was not unreasonable. Id. at 644; *Jefferson v. Zant*, 263 Ga. 316 (3) (a) (431 SE2d 110) (1993) (whether an attorney's trial tactics are reasonable is a question of law, not fact).

Moreover, Carr cannot show actual prejudice with regard to the mitigating evidence that trial counsel allegedly failed to elicit from Mrs. Carr. Most of the information regarding Carr's childhood contained within Mrs. Carr's pretrial narrative and habeas corpus affidavit was presented to the jury through other witnesses. Carr testified that his father was an abusive alcoholic, that his parents divorced when he was 11 years old, that he began abusing drugs and alcohol at an early age, and that he was sexually and physically abused. Darien Bogenholm, the mitigation specialist, also testified that Mrs. Carr had a difficult pregnancy with Carr, that he had been born with a cone-shaped head, that Carr was beaten when he tried to stop his father's abuse of his mother when he was a child, that Carr was sexually abused, that Carr's newborn child died in his arms, that his marriage had been troubled, and that Carr had been depressed over the deaths of his father and grandparents. Ms. Bogenholm related some of the same anecdotes describing the abuse inflicted by Carr's father that are included in Mrs. Carr's narrative and affidavit. Dr. Storms further testified that Carr blamed himself for his father's death because they had argued and Carr had "wished him dead" before his fatal car accident. We conclude that there is no reasonable probability that the limited amount of additional mitigating evidence that Mrs. Carr could have testified about at trial would have changed the outcome of the sentencing phase of Carr's trial. See *Mobley*, supra at 641; *Moon*, supra at 99; *Hammond*, supra at 883.

The habeas court also found that trial counsel was deficient for failing to present evidence that corroborated Carr's testimony that an infamous Macon-area pedophile had molested him when he was a child. Specifically, the habeas court stated that two of Carr's cousins "could have testified or spoken to a defense mental health expert about the sexual abuse inflicted on petitioner by [the pedophile]." This finding cannot support a showing of deficient performance for several reasons. First, the habeas and trial records show that Ms. Bogenholm interviewed at least one of these cousins before trial. Second, Carr testified that he had been sexually abused by a cousin and Ms. Bogenholm specifically named both of these cousins in her trial testimony as having sexually abused Carr when he was a child. Third, one of these cousins is serving multiple life sentences for a double murder, and both of these cousins were involved in a molesta-

tion incident that broke Carr's leg when Carr was five years old. Fourth, when asked why he had not called more family members as mitigation witnesses, Martin testified that he did not feel that calling them would be in Carr's best interest because "I could not know that what they told me today, they would tell me the same thing tomorrow because there were instances when they didn't." When asked specifically why he had not called Carr's double-murderer cousin to testify, Martin replied that trying to influence the jury with that kind of witness would not have been very wise. There was no deficient performance. Trial counsel presented testimony from Carr and Ms. Bogenholm that the pedophile had abused Carr, and Ms. Bogenholm did interview at least one of the cousins for corroboration. Further, it was not unreasonable trial strategy for trial counsel to avoid presenting child molesters and murderers as mitigation witnesses. See *Mobley*, 269 Ga. at 644-645 (when determining deficient performance, courts must be highly deferential to trial decisions made by counsel that are motivated by a reasonable trial strategy).

The habeas court found that trial counsel was deficient for failing to present evidence that Carr's father had sexually abused him when he was a child. Dillon testified on habeas corpus that Carr had told him before trial that his father had sexually abused him; Martin testified that he remembered Carr saying his father had "made moves on him." However, none of the mental health experts who interviewed Carr apparently elicited this information; at trial, they mentioned physical abuse by Carr's father, but no sexual abuse by him. Carr described to the jury the sexual abuse he had endured from cousins and acquaintances, but only connected his father to physical abuse. Ms. Bogenholm testified in detail about the sexual abuse Carr had suffered as a child, including naming two male cousins, a female cousin, and two other pedophiles as perpetrators, but she only linked Carr's father to physical abuse. While we are not convinced that the failure to present evidence of sexual abuse by Carr's father constituted deficient performance, we conclude that there is no actual prejudice to Carr from the failure to present such evidence. See *Mobley*, supra at 641; *Moon*, supra; *Hammond*, supra. Trial counsel, through expert witnesses and Carr himself, presented extensive, detailed evidence about childhood sexual abuse endured by Carr at the hands of family members and others. Additional evidence that Carr's father also sexually abused him would not in reasonable probability have changed the result of the sentencing phase. Id.

The habeas court's finding that "counsel failed to present evidence concerning petitioner's reaction to the death of his father" is clearly erroneous. At trial, Dr. Storms testified that Carr blamed himself for his father's death because he had "wished him dead" after an argument and Carr's father had been killed in a car accident a

short time later. Carr's mother testified that Carr had cried when his father died. Ms. Bogenholm also testified that Carr had been severely depressed after the death of his father.

The habeas court also faulted trial counsel for failing to contact and present "numerous witnesses who would have described his depression and mental state in the days preceding Young's death and who would have testified about Burgeson's abusive behavior toward petitioner." The habeas court then listed three cousins, an uncle, an ex-wife, and a friend who should have been contacted and presented at trial. This finding is partly clearly erroneous and does not support a finding of deficient performance. First, the habeas record shows that Martin and Ms. Bogenholm did in fact contact several of these potential witnesses. Second, Martin testified at the habeas hearing about his reluctance to call more Carr family members to testify due to what he perceived to be a lack of consistency and reliability in their statements. This is a valid strategic reason for limiting the use of these witnesses. *Billups v. State*, 272 Ga. 15 (2) (b) (523 SE2d 873) (1999). Third, when asked specifically about possibly calling Carr's friend to testify, Martin said he was "not at all what I wanted on behalf of Mr. Carr" due to the friend's heavy drug use. See *Mobley*, supra at 644-645 (courts must be highly deferential to trial counsel's reasonable strategic decisions). The friend had also been previously convicted with Carr for a burglary, had committed numerous other uncharged burglaries with Carr, and had been Burgeson's previous boyfriend. We further note with regard to other potential witnesses that Carr's uncle had served 12 years in prison in California for murder, and that Carr's ex-wife had cheated on Carr with the aforementioned friend. Even if trial counsel had been deficient, there is no actual prejudice because Carr and his experts testified about Carr's depressed and drug-affected mental state before the murder as well as Burgeson's dominating personality and behavior. See *Smith*, supra. In addition, several State witnesses testified about the drugs and alcohol being used at the party, one of Carr's other uncles testified about Carr's depression on the day of the murder, and a State witness, who had known Burgeson for years, admitted on cross-examination that she was afraid of her. Id.

(4) *Trial counsel's alleged failure to present evidence of Burgeson's history of violent and dominating behavior.* The habeas court found trial counsel ineffective for failing to contact three potential witnesses, the female juvenile's friend, the female juvenile's cousin, and the victim's cousin, to support the defense theory of Burgeson's violent and controlling behavior. The habeas court found that, as a result of the failure to utilize these witnesses, "counsel only presented petitioner's testimony to support this theory." It is a clearly erroneous finding that trial counsel only presented Carr's testimony

to show Burgeson's dominating personality. In addition to Carr, all three expert witnesses testified about Burgeson's controlling, dominating personality and a State witness on cross-examination admitted that she was afraid of Burgeson. Dr. Storms, in fact, had personally performed a court-ordered mental evaluation of Burgeson and he spoke about her dominant, intimidating personality, which he contrasted with Carr's psychologically dependent personality. Trial counsel was not deficient for failing to discover and utilize these three peripheral witnesses to also state that Burgeson was dominating and controlling. *Mobley*, supra at 640-641.

(5) *The failure to call John Ellis as a mitigation witness.* John Ellis was a psychiatric social worker who periodically treated Carr for a year while Carr was in jail. Before trial, Ellis prepared a "Psychosocial Treatment Summary," which detailed the course of Ellis' treatment of Carr and recited some of the important themes and events of Carr's life. The summary concluded that Carr "has the potential to become a very functional member of society." The habeas court found that trial counsel's failure to call Ellis as a mitigation witness or to provide the defense experts with Ellis' report contributed to trial counsel's deficient performance and was prejudicial to Carr's case. The habeas court acknowledged that Martin had considered calling Ellis, but Martin "did not feel he had the expertise or training to help petitioner." The habeas court deemed this reason to be inadequate because Ellis had considerable training and experience working with inmates, and because Ellis testified that Martin had not inquired about his background when they had spoken before trial. Therefore, according to the habeas court, Martin's otherwise valid strategic reason was deficient because it was based upon inadequate investigation. This finding regarding trial counsel's strategy is erroneous because it omits the second part of Martin's rationale for not presenting Ellis' testimony, that "I felt the people who I had amassed and [were] going to use were going to be sufficient to do what I was appointed to do." Trial counsel utilized four experts in the investigation of Carr's mitigation case and presented three of them at Carr's trial. It was reasonable under these circumstances for trial counsel to determine that it had enough experts to support Carr's mitigation case, and cease obtaining additional experts for trial. See *Mobley*, supra; *Baxter v. Thomas*, 45 F3d 1501, 1513 (11th Cir. 1995) (there are many situations where an attorney may make a reasonable strategic decision not to continue pursuing a line of investigation). Moreover, the information in Ellis' treatment summary is generally consistent with the evidence presented by Carr's experts at trial. Trial counsel was not ineffective for failing to utilize John Ellis.

(6) *Trial counsel's failure to present evidence of alcoholism, drug abuse, and mental illness in Carr's family.* The habeas court found

that trial counsel failed to use available evidence of a history of alcoholism, substance abuse, and mental illness in Carr's extended family. The habeas court specifically referred to evidence that Carr's aunt had been diagnosed with depression and schizophrenia, his grandmother had had a nervous breakdown, and that many members of Carr's extended family had been alcoholics and drug users. It found that trial counsel should have provided this information to the experts and that counsel failed to present this evidence at trial. It is doubtful that trial counsel could be deficient for failing to provide the experts with this information since the experts also interviewed Carr and many of his family members and had as much opportunity to uncover this evidence as trial counsel; Ms. Bogenholm, in fact, was hired by trial counsel specifically to conduct a mitigation investigation of Carr's background. See *Mobley*, supra. However, even if trial counsel was deficient, we conclude that Carr cannot show actual prejudice with regard to this evidence. At trial, Carr's counsel presented extensive evidence of Carr's substance abuse problems and traced them to the lack of supervision he received as a young teenager from his alcoholic father. Trial counsel also presented extensive evidence of Carr's depression and suicidal tendencies and traced them to the breakup of his marriage and the deaths of his father, grandparents, and child. Additional evidence that Carr had a schizophrenic aunt and relatives with alcohol and drug problems would not have reasonably changed the sentencing verdict. *Smith*, supra; *Hammond*, supra; *Moon*, supra.

(7) *Counsel's failure to obtain Carr's birth records or have testing performed to establish Carr's brain injury at birth.* The habeas court found that trial counsel was ineffective for failing to obtain Carr's birth records. The habeas court found that the birth records would have supported Ms. Bogenholm's testimony that Carr's birth had been difficult and led to problems later in life. The birth records state that Carr was born by way of "a difficult forceps delivery," which resulted in abrasions around the face and neck, a seventh cranial nerve palsy, and facial asymmetry. The records show that facial symmetry was restored within two days, and that Carr was discharged five days after birth without the palsy and doing well. The newborn obstetrical summary that is part of the birth records for Carr lists him as being a normal infant with a good condition at birth. On habeas corpus, Dr. Cheatham testified that, while he had conducted CT and MRI brain scans that suggested Carr had brain damage of a perinatal origin and had received anecdotal information of Carr's birth trauma, he did not order neuropsychological testing which would have pinpointed the nature and extent of Carr's brain injury because he lacked specific documentation of birth trauma. He assumed that since he was not provided with such documentation

there was not a significant history of birth injury. Carr has presented on habeas corpus the affidavits of a neuropsychologist and a neurologist who state that they would have determined that Carr's brain damage predisposed him to impulsivity and compromised his ability to use sound judgment.

Carr's counsel was not ineffective with regard to the birth records for two reasons. First, Carr cannot show actual prejudice with regard to the birth records not being introduced at trial. Ms. Bogenholm's testimony that birth difficulties could have led to Carr's problems later in life was in fact supported by the testimony of Dr. Cheatham, who testified that brain scans revealed that Carr had brain damage, which probably resulted from his difficult birth or from rough play early in life. The birth records are also not entirely favorable to Carr's argument since they show that birth trauma quickly healed and they list his birth as "good" and "normal." The records also contradict Ms. Bogenholm's testimony that Carr's was a breech birth. Second, we cannot conclude that trial counsel was deficient for failing to provide Carr's birth records to Dr. Cheatham, who would have allegedly ordered neuropsychiatric testing. Dr. Cheatham testified on habeas corpus that he was aware of the anecdotal information about Carr's birth trauma and that he had brain scans which suggested brain damage of perinatal origin. There is no record of Dr. Cheatham specifically requesting that trial counsel obtain Carr's birth records or informing trial counsel that they would be important at trial. See *Head v. Taylor*, 273 Ga. 69, 81-82 (538 SE2d 416) (2000). It is simply not reasonable to put the onus on trial counsel to know what additional information would have triggered Dr. Cheatham to order neuropsychiatric testing; a reasonable lawyer is not expected to have a background in psychiatry or neurology. See *Mobley*, supra at 640.

(8) *Trial counsel's failure to effectively challenge the reliability of Carr's tape-recorded statement.* At trial, the State presented the audiotape of Carr's recorded conversation with Burgeson after their arrest. Later, Carr testified that he had ingested hallucinogenic mushrooms and had been injured and received pain medication before this conversation with Burgeson. Trial counsel also presented Dr. Cheatham, who testified that he had read the transcript of Carr's audiotaped statement, and he opined that the taped comments were not reliable because Carr was impaired by hallucinogens, trying to be macho in front of Burgeson, and affected by his recent injury and the resulting pain medication. On cross-examination, the prosecutor pointed out that Dr. Cheatham had not heard the actual tape, but had only read the transcript, and therefore did not know the tone of Carr's voice during the conversation. Because of this cross-examination, the habeas court found trial counsel ineffective for fail-

ing to provide the audiotape to Dr. Cheatham, thereby inadequately preparing him for trial. This finding does not support a showing of deficient performance; a reasonable lawyer could have prepared an expert for trial by furnishing him the transcript only. *Mobley*, supra. Moreover, with regard to actual prejudice, Dr. Cheatham made clear on direct examination that he based his opinion of the reliability of the taped conversation on the matters discussed and on the manner in which Carr and Burgeson repeatedly and erratically switched topics, something which is apparent from the transcript. In addition, the jury itself heard the audiotape.

Carr also was not prejudiced by the failure of trial counsel to obtain Carr's Tennessee medical records to show the specific drugs he had been treated with after his crash. Even though the specific medications were not named, trial counsel used the testimony of Dr. Cheatham and Carr to show that hallucinogenic mushrooms, injury, and unspecified pain medication had affected the reliability of Carr's audiotaped comments. On the audiotape, Carr and Burgeson spoke about receiving pain medication after the car crash and Burgeson stated that the pill they gave her was "strong." Had the jury known that before the audiotaped conversation Carr had been specifically given ibuprofen and Nalfon, an anti-inflammatory drug, it would not reasonably have resulted in a sentence less than death. *Strickland*, 466 U. S. at 695.

(9) *Trial counsel's failure to present evidence of Carr's good character and social value.* At Martin's request, Carr's mother solicited written comments about Carr from 18 friends, family members, and acquaintances approximately a month after Carr's arrest. The average length of these letters is three sentences; many are only one sentence long. The gist of virtually every single one is that Carr was not a violent person, had never been violent, and was not capable of committing the crimes with which he had been charged. On habeas corpus, the habeas court found trial counsel ineffective for failing to present any good character evidence about Carr and pointed to these "testimonials" as evidence that a number of individuals could have testified on Carr's behalf. When asked at the habeas hearing why he had not presented good character evidence, Martin responded, "When the State had his record and you had the evidence before you, I saw no reason to go into character evidence. I didn't have any characters to put in." The habeas court focused on the second sentence and the fact that nine of these potential witnesses provided affidavits on habeas corpus stating that trial counsel had not contacted them as proof that trial counsel was ineffective. We conclude, however, that trial counsel's performance was not deficient. First, the habeas court's finding that trial counsel failed to present any good character evidence is clearly erroneous since trial counsel presented Carr's

mother and uncle to testify about Carr's good, non-violent character. Second, it was not unreasonable for trial counsel to avoid presenting a large amount of character witnesses because, as Martin stated on habeas corpus, it would not have been effective in light of Carr's criminal record and the evidence presented at trial. See *Chandler v. United States*, 218 F3d 1305, 1321-1325 (11th Cir. 2000). It was reasonable for trial counsel to focus instead on expert witnesses to support his defense of diminished capacity due to intoxication, control by Burgeson, and a history of physical, sexual and substance abuse. See id. This is especially true in light of the weak nature of this mitigating character evidence. Id. A succession of mitigation witnesses, including several witnesses whose only contact with Carr had occurred when he had periodically visited his father at his father's workplace, testifying that Carr was polite and never violent would have been easily rebutted by the State with evidence about Carr's juvenile adjudication for hitting his father with a stick, with his prior adult convictions for burglary and theft, and with the overwhelming evidence of his guilt in the victim's murder. Trial counsel was not ineffective with regard to the presentation of good character evidence.

D. *Other ineffective assistance claims.*

The habeas court correctly found Carr's remaining claims to be without merit. These claims include the failure to obtain a change of venue and the failure to challenge the admissibility of Carr's juvenile adjudication for simple battery. Overall, since the habeas court's finding of ineffective assistance of counsel in the penalty phase is erroneous, we reverse the vacation of the death penalty and reinstate that sentence.

## THE CROSS-APPEAL

5. Carr claims in his cross-appeal that the habeas court erred by failing to find prosecutorial misconduct relating to the alleged deals with the juvenile witnesses and Carr, and by failing to find ineffective assistance of trial counsel regarding the alleged deal with Carr, the failure to change venue, the presentation of the guilt-innocence phase defense, the failure to challenge Carr's juvenile adjudication for battery, the presentation of Carr's appellate case, and other areas regarding the presentation of Carr's defense. Carr also alleges that the habeas court erroneously failed to find that Carr's juvenile adjudication for battery was unconstitutional or that there had been jury misconduct. Carr further avers that the habeas court erred by finding a number of his habeas claims to be procedurally barred or defaulted. We addressed and resolved most of the cross-appeal claims in the context of the warden's appeal and found them to be without

merit. Any claims not previously addressed in this opinion are also without merit.

*Judgment affirmed in Case No. S00X1800 and reversed in Case No. S00A1798. All the Justices concur.*

DECIDED MARCH 19, 2001 —
RECONSIDERATION DENIED APRIL 5, 2001.

*Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Beth A. Burton, Assistant Attorney General,* for appellant.

*Brian S. Kammer, Nila J. Robinson,* for appellee.