## S08A0115. HALL v. MCPHERSON.
(663 SE2d 659)

SEARS, Chief Justice.

Mark McPherson was convicted of malice murder, financial transaction card theft, and two counts of theft by taking in 2000, and he was sentenced to death for the murder. This Court affirmed McPherson's convictions and death sentence.[1] In 2003, McPherson filed this habeas corpus action raising numerous claims. In its final

---

[1] *McPherson v. State*, 274 Ga. 444 (553 SE2d 569) (2001), cert. denied, 537 U. S. 870 (123 SC 277, 154 LE2d 118) (2002).

order of August 24, 2007, the habeas court denied relief on all grounds save one. The habeas court vacated McPherson's death sentence based upon its finding that his trial counsel had been ineffective in the investigation, preparation, and presentation of mitigation evidence. The Warden appeals the habeas court's vacation of the sentence.

The evidence adduced at trial showed that McPherson and the victim, Linda Ratcliff, had been dating for several months and had moved into a mobile home together shortly before Ratcliff's murder. On March 8, 1998, Ratcliff accompanied McPherson to a residential drug treatment center where he was admitted to a five-day program in the detoxification unit. However, after two days, McPherson checked himself out of the center against medical advice. Ratcliff was last seen alive the following evening, March 11, when McPherson picked her up from work driving her car. On March 16, a co-worker checked on her, leading to the discovery of her body inside the mobile home she shared with McPherson. The medical examiner testified that the contents of her stomach were consistent with the meal she had eaten at 7:30 p.m. on March 11 and, thus, opined that her death occurred between 9:00 and 11:00 that evening. She had been manually choked and beaten severely in the face and head, probably with a ball peen hammer found in the kitchen trash can. McPherson was arrested on March 18 in Atlanta, where he and fellow addict Ronnie Owens had traveled in Ratcliff's car. This Court held that the evidence presented at trial was sufficient for the jury to find that McPherson caused Ratcliff's death and then stole her car, cell phone, credit cards, and envelope of $100 bills.[2]

1. The habeas court vacated McPherson's death sentence based on its conclusion that trial counsel rendered ineffective assistance of counsel by inadequately investigating and presenting mitigating evidence in the following areas: (1) McPherson's childhood history of abuse and neglect and (2) psychiatric evidence regarding McPherson's history of substance addiction and major depression.

Our review of the habeas record[3] shows that the habeas court's factual determinations regarding those areas where it found deficiencies were not clearly erroneous.[4] The remaining issue before this Court as a reviewing court is to independently determine whether those factual findings are legally sufficient to show ineffective

---

[2] *McPherson*, supra, 274 Ga. at 445-446 (1).

[3] The habeas court properly insisted that the trial record, including the transcript of the trial, be admitted as an exhibit in the habeas proceedings. See OCGA § 9-14-48 (d) ("The [habeas] court shall review the trial record and transcript of proceedings. . . .").

[4] See *Strickland v. Washington*, 466 U. S. 668, 698 (IV) (104 SC 2052, 80 LE2d 674) (1984); *Head v. Taylor*, 273 Ga. 69, 71 (3) (538 SE2d 416) (2000).

assistance of counsel, that is, whether those facts support the legal conclusions both that counsel's performance was deficient under constitutional standards and that the deficient performance actually prejudiced McPherson in that it in reasonable probability changed the outcome of the trial.[5]

Shortly after McPherson was arrested and incarcerated for the crimes, his mother retained Robert Pope, a private attorney from Cartersville, to represent him. In late August 1999, the trial court became concerned that no motions had been filed in the case in over a year and that Pope lacked the qualifications necessary to try a death penalty case. Therefore, the trial court designated as lead counsel James Wyatt, an attorney experienced in death penalty cases whom the trial court had already appointed to assist Pope, and permitted Wyatt to select as his co-counsel William Newton, who also had death penalty experience. Although Pope continued in the case through trial, Wyatt testified in the habeas court that he purposely kept Pope's role to a minimum. The habeas court makes no mention of Pope in its order, and references to "counsel" indicate one or both attorneys who were appointed by the trial court.

2. We find no merit to the Warden's argument that the habeas court erred as a matter of law by relying upon the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases and the Southern Center for Human Rights Defense Manual in evaluating counsel's performance.[6] Upon review of the habeas court's order and the record, we conclude that the habeas court

> conduct[ed] an objective review of [counsel's] performance measured for "reasonableness under prevailing professional norms," [cit.], which include[d] a context-dependent consideration of the challenged conduct as seen "from counsel's perspective at the time." [Cit.][7]

---

[5] *Schofield v. Gulley*, 279 Ga. 413, 413 (I) (614 SE2d 740) (2005); *Head v. Thomason*, 276 Ga. 434, 436 (1) (578 SE2d 426) (2003); *Head v. Carr*, 273 Ga. 613, 615-616 (4) (544 SE2d 409) (2001).

[6] *Wiggins v. Smith*, 539 U. S. 510, 524 (II) (B) (1) (123 SC 2527, 156 LE2d 471) (2003) (measuring counsel's performance against the current state professional standards and the standards for capital defense work articulated by the ABA Guidelines "to which [the Supreme Court] long ha[s] referred as 'guides to determining what is reasonable' ") (citing *Strickland*, supra, 466 U. S. at 688, and *Williams v. Taylor*, 529 U. S. 362, 396 (120 SC 1495, 146 LE2d 389) (2000)); *Franks v. State*, 278 Ga. 246, 261 (B) (7) (599 SE2d 134) (2004) (recognizing the Supreme Court's use of the ABA's Guidelines and "the standard practice of the jurisdiction at the time" in measuring trial counsel's mitigation investigation) (citing *Wiggins*, supra, 539 U. S. at 524 (II) (B) (1)).

[7] *Wiggins*, supra, 539 U. S. at 523 (II) (A).

*Deficient Performance*

3. *Investigation, preparation, and presentation of childhood history of abuse and neglect.* Rather than hire a mitigation investigator[8] to investigate McPherson's background for life history mitigation evidence, Wyatt testified that he had an understanding with McPherson's mother that he was available at his office one evening a week to discuss the case with her and any individuals, such as family members, friends, and co-workers, whom she wished to bring with her, and he testified that he relied on these weekly sessions as his primary source for information regarding McPherson's life history. However, Wyatt had information within several documents in his file that should have raised concerns regarding the role McPherson's mother played in his childhood abuse and neglect. Among those documents was Dr. Samuel Perri's court-ordered psychiatric evaluation of McPherson. That evaluation included a social history in which McPherson reported that his alcoholic mother had been physically and verbally abusive to and neglectful of him and his brother during their childhood. Wyatt does not dispute that he was aware of this information. He, in fact, sent Dr. Perri's evaluation, including this social history, to Dr. Mark Hutto, whom he retained to conduct an independent psychiatric evaluation of McPherson shortly before trial. Not only did Wyatt rely almost exclusively upon McPherson's mother as his source of information regarding McPherson's life history, but he testified that he never considered asking her about her son's allegations because he "just didn't make the connection" between the abuse and neglect reported in Dr. Perri's evaluation and presenting mitigating evidence of "[McPherson's] terrible childhood at age ten or eleven."

Trial counsel also failed to contact McPherson's brother, Joel, despite having knowledge that McPherson's mother had allegedly abused McPherson and Joel during their childhood, that Joel was McPherson's only sibling and two years older than McPherson, and that Joel was incarcerated within the state at the time of trial preparation and could be easily located for an interview. While counsel noted that Joel was incarcerated, he never provided a reason for not contacting him. However, as Joel was likely to have firsthand knowledge of any childhood abuse and neglect that McPherson

---

[8] While Wyatt sought and obtained funds to hire an investigator whom he had previously utilized in death penalty cases, he testified that he viewed this investigator's role as limited to finding and interviewing "fact" witnesses.

suffered, counsel's failure to at least contact him was unreasonable under the circumstances.[9]

Trial counsel also failed to pursue other obvious sources of information.[10] McPherson provided defense counsel with a list of youth detention centers, group homes, and foster homes where he was placed during his youth; yet, the record shows that counsel failed to seek McPherson's records from many of those facilities. When questioned regarding the failure to obtain McPherson's records from those various facilities, counsel responded that one of the facilities, the Dick Wicker Boys' Home, had been closed for years, and that they did not know whether other facilities "would have any records saying [McPherson] was there or not, especially 20 years [later], but [that they] made some efforts to contact some of these places." However, the record does not reveal evidence of any unsuccessful efforts to obtain those records; and despite counsel's testimony that McPherson's institutionalization as a child was part of their mitigation theory, there was no testimony in the sentencing phase of McPherson's trial regarding his being removed from the home as a child and placed in State custody. In contrast, habeas counsel submitted records from the Dick Wicker Boys' Home that support McPherson's allegations of childhood neglect by an alcoholic mother and that substantiate his involvement with marijuana at least by the time he had reached his early teens. Those records also contained information regarding the Gambles, who were McPhersons's childhood neighbors and foster parents for more than a year. The name of Linda Gamble, McPherson's foster mother, also appeared as the only individual on the list that McPherson provided to trial counsel of places where he spent time during his youth, yet trial counsel failed to contact her and could not recall whether they even followed up with McPherson as to who she was. As the record shows that counsel's failure to investigate further into McPherson's life history was not a strategic decision but stemmed from counsel's inattention, the habeas court properly found that counsel's failures in this area were unreasonable.[11]

Our comparison of the trial record and the habeas record shows adequate support for the habeas court's conclusion that trial counsel were deficient in presenting evidence at the sentencing phase about

---

[9] See *Gulley*, supra, 279 Ga. at 415 (I) (A) (noting that there was nothing in the record to suggest that failure of habeas petitioner's trial counsel to interview his half-brother "resulted from anything other than neglect").

[10] *Franks*, supra, 278 Ga. at 261 (B) (7).

[11] *Terry v. Jenkins*, 280 Ga. 341, 347 (2) (c) (627 SE2d 7) (2006) ("Counsel's failure to investigate is unreasonable where . . . it resulted from inattention and not from reasoned strategic judgment. [Cit.]").

McPherson's childhood history of abuse and neglect. The most significant difference between the evidence presented in the two proceedings was the testimony of McPherson's foster mother and his brother.

At the habeas evidentiary hearing, Gamble testified that, when McPherson was about ten years old, her family and his lived in the same neighborhood and that she could see his home from her house. She stated that she had seen McPherson's mother hit him with a belt and that on different occasions she had observed on his body whelps, bruises, and belt marks so severe she could plainly make out indentations from the belt's eyelets. She also testified that on many weekends McPherson was not allowed home, even at night, in order that his mother could be alone with her boyfriends, which meant he slept in abandoned cars or in a neighborhood tree house, dependent on other children to "sneak" food to him. According to Gamble, McPherson's mother often chased him while shouting profanities at him, threatening to kill him, and brandishing items such as liquor bottles, knives, and baseball bats. She stated that McPherson was always poorly clothed and often wore no shoes, even in cold weather, and that he was always hungry, regularly appearing at her house at mealtimes. She frequently observed him going through the dumpsters at the nearby school and roaming the street as late as 11:00 p.m. and as early as 3:00 a.m., and she often noticed that his mother's car was gone for several days at a time while McPherson and his brother were home alone. She described in detail one occasion when, as a pre-teen, McPherson sought refuge in her home shortly after she saw his mother chase him from his house with a whiskey bottle and a baseball bat. His back was covered with belt marks, and his mother did not come to look for him until a couple of days had passed. When the police were called, the officer told her that he could take McPherson to a youth detention center "to get him out of that environment." Gamble testified that some time later, at McPherson's request, she became his foster mother and that he thrived in her home for more than a year, remaining drug-free and doing well in school, and yet his mother never visited him while he lived with her family.

McPherson's older brother, Joel, testified that their mother was mean when she was drunk and that when he was young, she and her boyfriend frequently "came home drunk." He stated that his mother beat him with belts, whips, boards, and her hand, that he had suffered broken bones and lacerations as a result, and that she beat McPherson in a similar manner. Joel testified that McPherson was "maybe 12" the first time they smoked marijuana together and that when McPherson was in his early teens, he also introduced him to other drugs, including LSD. According to Joel, as children, he and

McPherson were regularly exposed to his mother's use of alcohol with her boyfriend and to her use of marijuana and alcohol with her second husband, who was McPherson's stepfather when he was approximately nine to eleven years old. Both Joel and the mother also testified at the habeas hearing that this stepfather physically abused McPherson in various ways, including beating him with two belts wrapped together.

Trial counsel, in contrast, presented a significantly different picture of McPherson's childhood. Through the testimony of McPherson's mother, her sisters, her third husband, and her best friend, counsel established that McPherson's father had abandoned the family by the time McPherson was about three years old, and counsel focused on the fact that McPherson never had a positive male role model. While his mother acknowledged that McPherson and his brother were sometimes unsupervised for an hour in the afternoons before she arrived home from work and that, when McPherson was about ten years old, she sometimes left him and his brother alone while she worked nights at a bar, the testimony presented at trial generally portrayed McPherson as a child who did not receive the supervision he needed because his mother, as a single parent, was working at least two jobs to provide their support. For instance, McPherson's mother testified that, although McPherson "had never been a drinker," he told her after becoming an adult that he would sneak drinks from bar patrons without her knowledge when she took him as a child to the bar where she worked. According to the testimony presented at trial, McPherson and his mother were always close because they shared the same birthday, and several witnesses testified that McPherson's mother had done everything she possibly could to help her son, including trying to keep him away from drugs. Ironically, his mother was the only witness who intimated to the jury that perhaps McPherson had experienced an abusive childhood. During her testimony, she volunteered that she "could have been called an abusive mother" because she "really believed in whipping [her] boys," and she disclosed that she "smacked the oldest one, Joel . . . one time and broke his hand."

However, trial counsel presented no evidence, as was presented in the habeas proceeding, that McPherson's mother had been a violent alcoholic during his childhood, that she had regularly physically and verbally abused and neglected him, that he had become personally involved with various drugs as a child, and that, in early adolescence, he had been removed from the home, placed in State custody, and had spent his youth in numerous foster homes, detention centers, and group homes.

Trial counsel's presentation was not strategic, as the testimony presented in the habeas evidentiary hearing would have supported

counsel's arguments at the sentencing phase of trial. In closing, counsel argued that, "with regard to mitigation, the defendant brought you a number of witnesses who talked about his [rough] life." While counsel presented ample testimony regarding McPherson's abandonment by his father, the witnesses only hinted at the extent and scope of the neglect that McPherson suffered from his mother, and there was no testimony regarding his childhood history of abuse or his placement in foster homes and group homes as a youth. Counsel acknowledged that McPherson's childhood drug use was an important mitigating factor, and in the sentencing phase opening statement, counsel stated that McPherson "had some problems from age 10 to 16" and was introduced to drugs during that time. However, they failed to support their assertion with testimony or evidence of McPherson's juvenile drug use. None of McPherson's witnesses could testify to exactly how or when he began using drugs, and several witnesses stated that they were not aware of his drug problem until his late teens or early twenties. As trial counsel's presentation was not strategic but stemmed from their inadequate investigation and preparation, it was deficient.[12]

4. *Investigation, preparation, and presentation of psychiatric mitigating evidence.* As previously noted, trial counsel hired Dr. Hutto to evaluate McPherson for mental illness and drug addiction issues for the purpose of discovering mitigating evidence. Dr. Hutto diagnosed McPherson with extreme psycho-social and environmental problems and cocaine dependence, amphetamine abuse, and cannabis dependence, which were in full remission in a controlled environment. Dr. Hutto stated in his report to counsel that crack cocaine, to which the testimony at trial showed McPherson had been highly addicted at the time of the crimes, produces "an extremely short 'high' or euphoric state" followed by an intense craving to achieve that state again. Dr. Hutto stated that, because this craving takes precedence over all other considerations, McPherson would only be concerned about finding more drugs. Thus, he opined that, even if McPherson did not commit Ratcliff's murder, he might use her death to his advantage without regard to her condition. During a discussion lasting "several minutes" between jury selection and the beginning of trial, counsel decided not to put Dr. Hutto on the stand, because they did not want him to be cross-examined regarding McPherson's denial of the murder. The habeas court found that, because the entire defense case at the guilt/innocence phase was that

---

[12] *Turpin v. Helmeci*, 271 Ga. 224, 226 (518 SE2d 887) (1999) (right to reasonably effective assistance of counsel is violated when trial counsel's omissions result from inadequate investigation and preparation rather than from trial strategy).

McPherson denied committing the murder and blamed Owens and because trial counsel actually led one witness during the sentencing phase to state that she did not believe that McPherson committed Ratcliff's murder, "the fear of having Dr. Hutto cross-examined about McPherson's denial of the crime was not a reasonable basis to eliminate Dr. Hutto's testimony and sacrifice the valuable information he could have provided."

Our review of the record, however, shows that counsel's concern was not the unreasonable concern that the jury would hear about McPherson's general denial of the murder and his placement of blame on Owens. Rather, trial counsel testified that they chose not to subject McPherson's version of events to cross-examination during the trial because they felt that, as a "kind of self-serving story," it would anger the jury. Because McPherson did not testify at trial, he never told his "story" to the jurors, and the transcript shows that neither did counsel present that "story" to them. Instead, trial counsel sought at the guilt/innocence phase to create a reasonable doubt in the minds of the jurors that McPherson committed Ratcliff's murder by discrediting Owens' testimony that he was not with McPherson until the morning following her murder and his alibi that he was home with his brother on the evening of the murder. Having decided to keep McPherson's "self-serving story" from the jury at the guilt/innocence phase, trial counsel testified that they did not want to subject to cross-examination at the sentencing phase that portion of Dr. Hutto's report in which McPherson conveyed that version to him, and they further stated that they were also "scared" of the comments McPherson made to Dr. Hutto about the night of the offense.

A review of Dr. Hutto's report shows that McPherson relayed to him that, after he drove Ratcliff back to the mobile home from her work and told her that he had pawned her cell phone, he "ostensibly" left to retrieve it. On the way, he saw Owens and then conceived a plan whereby Owens would go to the mobile home and deceive Ratcliff out of money to use to redeem the cell phone by telling her that McPherson owed him money and convincing her to pay him. However, when Owens did not rendezvous with McPherson as planned, McPherson returned to the mobile home and found Ratcliff's body lying on the floor as he entered. Owens told McPherson that he had asked Ratcliff for the money and that she had refused. McPherson then dragged Ratcliff's body to the bedroom and left her lying against the wall before going to her purse and taking her money, credit cards, and ATM card. McPherson pointed out to Dr. Hutto as evidence that Ratcliff's murder was not planned that he did not take Ratcliff's rings from her fingers, stating that, had it been planned, he would have taken those items as well. McPherson also

told Dr. Hutto that his checking into the drug treatment center shortly before Ratcliff's murder was part of a scheme to get more money from her for drugs and that, while he was at the drug treatment center, he used amphetamine given to him by another patient.

The choice not to call Dr. Hutto was a strategic decision.[13] Given the level of deference due such a decision,[14] the fact that McPherson's "story" and some of the comments he made to Dr. Hutto could reasonably be viewed as damaging to McPherson, and the fact that his report is not strongly favorable, it is at least arguable that the habeas court erred in finding that counsel's decision to forego Dr. Hutto's testimony was unreasonable.

On the other hand, Dr. Hutto testified that, had he been provided a complete file of McPherson's hospitalizations, his original diagnosis would still be warranted, but he "probably would add major depression, recurrent severe, in remission at the time" and that he could have testified at trial similarly to Dr. William Scott's favorable habeas testimony, which is discussed at length below. Although the habeas court found that at the time of his evaluation prior to McPherson's trial in 2000, Dr. Hutto had not been apprised by trial counsel that McPherson had been treated at Charter Peachford and Dr. Hutto testified at the habeas evidentiary hearing to that effect, he acknowledged on cross-examination that trial counsel provided him with Dr. Perri's social history, which contained the information that in the 1990's, McPherson had been "an inpatient at a Charter Peachford treatment center for drug treatment," where he was prescribed an antidepressant medication. Dr. Hutto also acknowledged that he never asked counsel for more documents regarding McPherson's psychiatric hospitalizations. However, the trial court, in granting counsel's motion for funds to hire Dr. Hutto, directed counsel to "aid Dr. Hutto in gathering information for a social history" rather than making funds available for that purpose. Therefore, trial counsel had the responsibility to seek and obtain all records relevant to McPherson's mental condition and drug addiction in order to forward them to Dr. Hutto. The record shows that Dr. Hutto was not provided any materials pertaining to McPherson's treatment at Charter Peachford in 1995. However, we need not decide whether the habeas court's factual finding regarding Dr. Hutto's knowledge of McPherson's treatment at Charter Peachford was clearly erroneous, because, even assuming trial

---

[13] *Roberts v. State*, 263 Ga. 807, 808 (2) (b) (439 SE2d 911) (1994).

[14] *Turpin v. Mobley*, 269 Ga. 635, 644-645 (3) (D) (502 SE2d 458) (1998) (reviewing court "must be 'highly deferential to those choices made by defense counsel in the conduct of a trial that are arguably dictated by a reasonable trial strategy.' [Cit.]").

counsel's decision not to call Dr. Hutto was reasonable, we find that counsel's failure to investigate, prepare, and present other reasonably available psychiatric mitigating evidence was unreasonable under the circumstances.[15]

As the habeas court found, trial counsel had several reasons to conduct a reasonable investigation into McPherson's history of drug use, which would have yielded *alternative* psychiatric mitigating evidence. The thrust of the State's case against McPherson at both phases of trial was his drug addiction and intoxication, including his history of thefts and burglaries to obtain money for drugs and his failure to remain in detoxification clinics. Wyatt testified at the habeas evidentiary hearing that, because McPherson was on a crack cocaine binge before, during, and after the crimes, drug abuse and addiction "[were] just in the case every way possible." As previously discussed, the trial court had given counsel the responsibility to obtain and forward to Dr. Hutto all records relevant to McPherson's mental condition and drug addiction.

Trial counsel were also on notice that the State intended to present in aggravation some type of mental health evidence, as the State served on the defense prior to trial McPherson's 1988 Northwest Georgia Regional Hospital records and his 1995 Coosa Valley-Three Rivers Behavioral Health System records and submitted a witness list bearing the names of witnesses from those facilities. Those records show that McPherson entered each facility for drug abuse treatment and each time insisted on being discharged before he completed detoxification. Trial counsel indicated during the habeas proceedings that, as a result of receiving service of those documents, they were aware that the State would possibly call mental health clinicians to testify against McPherson.

Moreover, this Court has held that, even if a defendant can distinguish between right and wrong, expert mental health testi-

---

[15] The Warden argues that, had trial counsel introduced psychiatric evidence, the State would have been able to introduce Dr. Alfred Messer's report in rebuttal. McPherson's original attorney obtained funds to retain Dr. Messer to conduct an independent psychiatric evaluation of McPherson. McPherson reported to Dr. Messer that he committed Ratcliff's murder during a drug-induced blackout, and Dr. Messer diagnosed McPherson with antisocial personality disorder. The Warden's argument is without merit. Trial counsel did not opt into the Reciprocal Discovery Act, and there is no evidence the defense ever intended on calling Dr. Messer at the trial due to his unfavorable report. Thus, counsel had no obligation to turn Dr. Messer's report over to the State, and there is no evidence that the State was even aware of Dr. Messer's report at the time of the trial. See OCGA § 17-16-1 et seq.; *Rower v. State*, 264 Ga. 323, 325 (5) (443 SE2d 839) (1994). Moreover, trial counsel never stated in his habeas testimony that he had feared that the State would obtain Dr. Messer's report if psychiatric evidence was presented. Finally, counsel would not have been required to make Dr. Hutto's report available to the State if they had presented evidence about McPherson's mental health through other sources.

mony and evidence regarding the effects of a history of substance abuse, as well as severe abuse at the time of the crimes,

> is critical at the penalty phase of a capital case "because in our system of criminal justice acts committed by a morally mature person with full appreciation of all their ramifications and eventualities are considered more culpable than those committed by a person without that appreciation." [Cit.][16]

Despite having numerous reasons to conduct a thorough investigation into McPherson's past drug abuse and mental history, trial counsel failed to obtain a complete file on McPherson's past hospitalizations. It is undisputed that counsel were aware from several sources that McPherson had been treated at Charter Peachford Hospital for drug addiction and depression in November 1995. Counsel even questioned McPherson's mother and his former girlfriend about this hospitalization during their testimony at the sentencing phase of trial. However, inexplicably, they never sought McPherson's Charter Peachford records and never contacted any personnel who treated him there.

At the habeas hearing, Dr. Scott, McPherson's treating psychiatrist at Charter Peachford, testified that McPherson had been admitted there after being referred by an attending physician at the Cartersville Medical Center emergency room, where McPherson had been admitted following a suicide attempt. Dr. Scott stated that in 1995 he diagnosed McPherson with major depressive disorder and a stimulant dependence (amphetamine with psychosis, cocaine dependence and withdrawal, crack cocaine dependence). Although he also diagnosed McPherson with antisocial personality disorder in 1995, Dr. Scott explained that this diagnosis was incorrect because he should have noted at the time that McPherson's antisocial symptoms were caused by his drug dependencies. Thus, he explained that a more accurate diagnosis would place the antisocial traits under the Axis I diagnosis of stimulant dependence and not an Axis II personality disorder. In support of the Axis I diagnosis, he testified that antisocial personality disorder is characterized by a lack of remorse, and he pointed out numerous instances in the Charter Peachford and Cartersville Medical Center records where McPherson had expressed remorse.

Dr. Scott also related McPherson's family tree showing a genetic predisposition to substance dependence disorder and his childhood

---

[16] *Bright v. State*, 265 Ga. 265, 275 (2) (e) (455 SE2d 37) (1995).

history — including his father's abandonment, his mother's abuse and neglect, and his being given alcohol as a child — as evidence that McPherson never had a choice in the matter of whether to develop drug and alcohol addiction problems in his life. Pointing out that McPherson had only undergone partial detoxification and had never been in treatment, Dr. Scott opined that only when a drug addict has been treated and is in a continuing program of recovery is he or she able to exercise free choice regarding drug use. Dr. Scott also stated that, at the time of McPherson's Charter Peachford hospitalization, he felt that it was important that McPherson complete his treatment because he was trying to get help and because he was likely to return to stimulant abuse to self-medicate his major depression otherwise. However, McPherson had to be released because his insurance would not cover his treatment and no other funds were available. Dr. Scott also testified that, at the time of Ratcliff's murder, McPherson's drug addiction required "minute to minute maintenance" before he was "crashing into agony again." Dr. Scott stated that, had he been contacted, he would have willingly testified at McPherson's trial without charging a fee for his time. Although, at trial, defense counsel elicited from McPherson's mother and former girlfriend the facts that McPherson had been treated for drug addiction at Charter Peachford and that he had remained in treatment until he was released because "the insurance money ran out," this testimony did not provide him "with the meaningful scientific and psychiatric evidence" that counsel reasonably had available to them.[17]

Counsel also failed to investigate the records served on them by the State for any mitigating evidence that could possibly be used in rebuttal, and they failed to interview personnel who treated McPherson at the facilities where the records originated. Contained within the documents served on trial counsel and utilized by the State in court is information that could have been used to rebut the State's claim that McPherson chose his life of addiction. In the 1995 Coosa Valley-Three Rivers records, in which McPherson was diagnosed with polysubstance abuse (cannabis, crank, and crack cocaine), he reported to treating personnel that "he ha[d] nowhere to go but want[ed] help," that he "fe[lt] he ha[d] hit bottom," and that he "need[ed] to pull himself out." Before discharge, he was evaluated to determine his eligibility for admission to outpatient services and was found "alert, attentive, appear[ing] highly motivated for treatment" and was scheduled to begin outpatient treatment five days after

---

[17] See *Bright*, supra, 265 Ga. at 276-277 (2) (e) (defendant's testimony from guilt/innocence phase of capital murder trial regarding his intoxication at time of murders did not provide basis for upholding trial court's failure to grant funds for independent expert assistance).

discharge. Although the outpatient records show that he only attended two scheduled group meetings in an eight-week program, they also document his struggle in attempting to remain free of crack cocaine "due to the cravings and the temptation from [his] associates." On the days on which he attended the group meetings, the clinician noted that McPherson "appear[ed] to want to remain substance free" and "seem[ed] to want help with his addiction."

McPherson submitted in the habeas proceeding the affidavit testimony of Dr. Benjamin Anderson, Jr., his treating physician when he was a patient at Coosa Valley-Three Rivers in 1995 and again in 1998 just prior to Ratcliff's murder. Dr. Anderson testified that the fact that McPherson was discharged against medical advice from both admissions was common for someone with a lengthy history of stimulant substance addiction and that, in his professional medical opinion, a few days of treatment do nothing to abate the overwhelming compulsion to use drugs that is the hallmark of stimulant addiction. He opined that someone like McPherson who was suffering from an active addiction at the time of admission could not benefit from treatment for the duration of either of McPherson's stays at Coosa Valley. He emphasized that McPherson's last stay, at a length of just two days, "would have had . . . no effect whatsoever on his addiction or his ability to control it" and that McPherson "would have left on March 10th just as ill and impaired as he was on March 8th." A review of McPherson's records from that stay shows that he was admitted for acute detoxification for his crack cocaine dependence, that he reported depression, insomnia, drug abuse, hallucinations and/or delusions, weakness/tiredness, and fatigue, that he showed an impaired ability to manage daily living activities and to make reasonable life decisions, and that he reported using $1,000 worth of crack cocaine over the past two days, had not slept for two days, and had not eaten for three days. Trial counsel elicited none of this testimony at the trial, which would have served to rebut the State's evidence that McPherson had twice checked himself out of drug treatment centers against medical advice and its contention that McPherson had been given numerous opportunities to get better but had willingly rejected them all.

No reasonable lawyer in counsel's position would have decided not to seek McPherson's drug treatment records, particularly his Charter Peachford records.[18] Trial counsel's investigation also was not reasonable in light of the guidelines set forth by the American

---

[18] See *Strickland*, supra, 466 U. S. at 690 (III) (A) ("[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."). See also *Baxter v.*

Bar Association, which provide that counsel at every stage of a capital case "have a continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation."[19] As counsel had no rational strategy or reason for failing to develop this mitigating evidence, their performance fell below an objective standard of reasonableness.

## *Actual Prejudice*

5. The Warden maintains that the habeas court erred in finding trial counsel ineffective for not presenting the mitigating testimony and evidence presented in the habeas court, because the habeas court in finding prejudice propounded an alternative mitigation theory to explain why McPherson committed Ratcliff's murder when trial counsel had strategically chosen a different mitigation theory based on residual doubt. The Warden's argument is based on certain statements in the habeas court's order indicating that such testimony and evidence could have informed the jury as to why McPherson committed Ratcliff's murder. However, those statements are not necessary to the habeas court's decision, as it found a number of reasons why McPherson was prejudiced by counsel's failure to present such evidence. Moreover, "[t]he proper standard of review requires that [this Court] accept the habeas court's factual findings unless clearly erroneous, but [that we] independently apply the legal principles to the facts."[20]

Both of McPherson's trial attorneys testified that McPherson consistently maintained his innocence to them, placed the blame on Owens, and refused to accept an offer to plead guilty in exchange for a sentence of life without the possibility of parole. Thus, as counsel testified, they felt compelled to follow their client's theory of the case in the guilt/innocence phase, and the sentencing phase strategy did entail "proceed[ing] on residual doubt with what [counsel] had brought out in the cross-examination of Ronald Owens." However, both Owens and McPherson's mother testified in the guilt/innocence phase that, before the victim's body was discovered, McPherson stated to them individually that he had seen the victim dead, and trial counsel conceded during closing argument in the guilt/

---

*Thomas*, 45 F3d 1501, 1514 (III) (B) (11th Cir. 1995) (deficient performance where defense counsel failed to take any steps to uncover readily available mental health mitigating evidence).

[19] ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, 10.11 (A), p. 108 (2003).

[20] *Carr*, supra, 273 Ga. at 616 (4) (citing *Linares v. State*, 266 Ga. 812 (2) (471 SE2d 208) (1996)).

innocence phase that McPherson was guilty of taking Ratcliff's car and credit cards, most likely after finding her dead. Trial counsel recognized that they had to mitigate the facts that McPherson admittedly was at the murder scene, took the victim's property rather than calling the police, and was high on drugs at the time of the crimes and afterward until the time of his arrest. Counsel testified that, as a result, they based their mitigation theory on McPherson's "total background including his history with drugs and neglect and being institutionalized as a child." Our review of the trial transcript bears this out, as it reveals that trial counsel propounded a broad mitigation theory encompassing not only residual doubt but also McPherson's lack of violent tendencies, his remorse, his lack of parental supervision, his early introduction to drugs and alcohol, and the absence of a positive male role model in his life. In sentencing phase opening statements, counsel told the jury that the defense expected to show, among other things, that McPherson was raised without a father and that his mother had to work two jobs, doing "the best she could" but that McPherson "pretty well did not have the support that children should have just for an economic reason"; that he was introduced to drugs sometime between "age 10 to 16"; that he got into trouble in his early adult years; and that he had a cocaine problem. We conclude that the habeas court's finding that the "testimony and evidence presented [in the habeas court] would have fulfilled counsel's acknowledged sentencing strategy of mitigating [McPherson]'s behavior prior to, at the scene of, and after the crime" was correct.

Moreover, we conclude as a matter of law that there was a reasonable probability that, were it not for trial counsel's deficient performance in investigating and presenting mitigating evidence, at least one juror would have been persuaded to vote for a life or life without parole sentence.[21] The only argument advanced by the State to convince the jury that McPherson deserved a death sentence was that he was beyond rehabilitation, as he had freely chosen a life of addiction despite having had the advantage of having people, his mother in particular, who had tried to help him all of his life. The evidence counsel should have presented would have greatly undermined this argument.

The testimony elicited at trial regarding McPherson's upbringing, in contrast to that presented at the habeas evidentiary hearing, not only failed to inform the jury of the extent and scope of the

---

[21] See *Thomason*, supra, 276 Ga. at 438 (1) (to show actual prejudice on claim of ineffective assistance at sentencing phase, petitioner must show reasonable probability that presentation of mitigating evidence presented at habeas hearing would have changed outcome of sentencing phase of petitioner's trial) (citing *Carr*, supra, 273 Ga. at 626).

childhood abuse and neglect McPherson endured and of his childhood exposure to alcohol and drug-abusing adults, but the trial testimony portrayed McPherson's mother as a long-suffering, hardworking, devoted mother to her sons who had done everything she could to keep McPherson away from drugs. The jury never heard that when McPherson was growing up, his mother was a violent alcoholic who chased him away from his home for days at a time and who often beat him, leaving him badly bruised, and that he spent much of his youth in foster homes or institutionalized.

The State argued that McPherson had rejected efforts at drug rehabilitation and presented as evidence in aggravation two mental health clinicians who testified that McPherson left their detoxification programs against medical advice. Rather than present readily available psychiatric mitigating evidence in rebuttal, counsel testified that they relied on Owens' appearance and testimony at the guilt/innocence phase "to show the jury what cocaine addiction can do." At the time of trial, Owens was incarcerated for unrelated crimes and was drug-free. On cross-examination, trial counsel asked him whether "the craving of cocaine will make you do a lot of things" and whether "when you want the next hit, you will do about anything," to which Owens simply responded affirmatively. This testimony did not explain, as a mental health expert could have, that, as a result of McPherson's childhood history of abuse and neglect that led to his major depression and his early exposure to alcohol and drugs, drug addiction and treatment were not simply matters of choice for him. Counsel's failure to adequately investigate and prepare psychiatric mitigating evidence regarding McPherson's drug dependence allowed the State to present its supporting evidence with virtually no challenge, enabling the prosecutor to argue in closing that "[McPherson] has . . . chosen himself not to accept the treatment of the hospital facilities . . . and so he has chosen the course in which he finds himself now." Under these circumstances, the habeas court did not err by finding actual prejudice. Therefore, we affirm the habeas court's finding of ineffective assistance of trial counsel and its vacation of McPherson's death sentence.

*Judgment affirmed. All the Justices concur, except Carley, J., who dissents.*

DECIDED JUNE 30, 2008 —
RECONSIDERATION DENIED JULY 25, 2008.

*Thurbert E. Baker, Attorney General, Mary Beth Westmoreland, Deputy Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Emily R. Roselli, Assistant Attorney General,* for appellant.