S09A1344, S09X1345. HALL v. LEE; and vice versa.

(684 SE2d 868)

BENHAM, Justice.

James Allyson Lee was convicted in 1997 of malice murder, felony murder, armed robbery, and possession of a firearm during the commission of a felony, and he was sentenced to death for the murder. This Court unanimously affirmed Lee's convictions and death sentence. *Lee v. State*, 270 Ga. 798 (514 SE2d 1) (1999). In 2000, Lee filed a petition for writ of habeas corpus, and he filed his amended petition on April 18, 2001. An evidentiary hearing was held on August 17, 2001, and, in its final order of March 16, 2009, the habeas court vacated Lee's death sentence based upon its finding that his trial counsel had been prejudicially deficient in investigating, preparing, and presenting mitigating evidence. The Warden appeals the habeas court's vacation of the sentence in Case No. S09A1344, and Lee cross-appeals in Case No. S09X1345. In the Warden's appeal, this Court reverses and reinstates Lee's death sentence. In Lee's cross-appeal, this Court affirms.

## I. Factual Background

The evidence presented at trial showed that Lee and an accomplice broke into a gun store in Toombs County on May 25, 1994, and stole several guns, including a ten millimeter Glock pistol. Lee and his girlfriend then drove to Pierce County planning to kill Lee's father and steal his Chevrolet Silverado pickup truck. After learning that his father was not home but that his father's live-in girlfriend, Sharon Chancey, was there, Lee had his girlfriend lure Chancey from the home in the early morning hours of May 26 by claiming that Lee was stranded nearby in his girlfriend's broken down Toyota automobile. When Chancey pulled up to the Toyota in the Silverado and got out, Lee shot her in the face and threw her in the back of the Silverado. After driving the Silverado to a secluded area in Charlton County, he dragged Chancey into the woods, removed two rings from her fingers, and shot her two more times when she grabbed his arm. After replacing the Silverado's license plate with the license plate from the Toyota, Lee and his girlfriend drove the Silverado to Florida. While traveling in the Silverado with two male friends at about 11:30 that night, Lee was stopped by law enforcement for a broken taillight. He was arrested after a check revealed that the Silverado was stolen. The police recovered from the Silverado Chancey's purse and identification and the Glock pistol, which later was determined to be the murder weapon. Lee made several incriminating statements to police, including videotaped statements at the scenes of the shootings describing how the crimes occurred.

*Case No. S09A1344*

## II. Ineffective Assistance of Counsel Claims

In Case No. S09A1344, the Warden appeals the habeas court's determination that trial counsel were ineffective for failing to adequately investigate and present life history and psychiatric mitigating evidence.

### A. *The Standard of Review*

To prevail on an ineffective assistance of counsel claim, Lee must show that counsel's performance was not reasonable under the circumstances and that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U. S. 668 (III) (104 SC 2052, 80 LE2d 674) (1984); *Smith v. Francis*, 253 Ga. 782 (1) (325 SE2d 362) (1985). "[W]e accept the habeas court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts. [Cit.]" *Turpin v. Lipham*, 270 Ga. 208, 211 (3) (510 SE2d 32) (1998).

### B. *Failure to Investigate for Mitigating Evidence*

*1. The appropriate rule under Strickland.* We first address the Warden's contention that the habeas court erred as a matter of law by creating and utilizing an improper standard in its determination that trial counsel were deficient in investigating and presenting mitigating evidence. The habeas court stated in its order that "the defendant has a 'constitutionally protected right' to have his attorney 'present[ ] and explain[ ] the significance of all the available evidence [in mitigation]' " and that " '[c]ompetent counsel . . . present[s] and explain[s] the significance of *all the available evidence* [in mitigation].' " (Emphasis in order) (quoting *Williams v. Taylor*, 529 U. S. 362, 393 (IV), 399 (V) (120 SC 1495, 146 LE2d 389) (2000)).

Although the habeas court's order ostensibly quoted the United States Supreme Court's decision in *Williams*, the order omitted a portion of the Supreme Court's statement and lifted phrases out of context. In doing so, it "mischaracterized at best the appropriate rule, made clear by th[e Supreme] Court in *Strickland*, for determining whether counsel's assistance was effective within the meaning of the Constitution." *Williams v. Taylor*, supra, 529 U. S. at 397. See id. at 390 (stating that the merits of the petitioner's ineffective assistance of counsel claim were "squarely governed" by *Strickland*). After its decision in *Williams*, the Supreme Court "emphasize[d] that *Strickland* does not require counsel to investigate every conceivable line of mitigating evidence" or even "to present mitigating evidence at sentencing in every case." *Wiggins v. Smith*, 539 U. S. 510, 533 (II) (B) (3) (123 SC 2527, 156 LE2d 471) (2003).

Therefore, the habeas court erred by requiring that counsel investigate and present all available mitigating evidence in order that their performance not be deemed constitutionally deficient. Trial counsel's decision not to investigate "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland v. Washington*, supra, 466 U. S. at 691. With that standard in mind, we now review counsel's investigation for mitigating evidence.

2. *Trial counsel's investigation.* Our review of the record shows that, shortly after Lee was arrested, John Adams was appointed to represent him. At that time, Adams had been practicing law in Charlton County for almost 20 years. While Adams was experienced in criminal litigation and had represented defendants accused of murder, Lee's case was his first death penalty case. Kelly Brooks, Adams' law partner and a Charlton County native, was appointed as co-counsel. Brooks had also never tried a capital case. The record supports the habeas court's finding that, because of the nature of the case and the strength of the State's evidence against Lee, counsel were aware of the important role the sentencing phase would play and immediately took appropriate steps to learn how to prepare a mitigation defense for Lee. Trial counsel testified that they consulted with several well-respected criminal defense attorneys in the area, including those who were experienced in death penalty litigation, and that Brooks observed a death penalty trial. The habeas court's order noted the fact that both Adams and Brooks testified that they reviewed and referenced the manual, "Defending a Capital Case in Georgia," published by the Southern Center for Human Rights.[1]

Trial counsel, who shared in the development and presentation of the mitigation defense, testified at the habeas evidentiary hearing that they asked Lee if he suffered any physical abuse during his childhood and that Lee told them that only isolated incidents of abuse occurred. Counsel stated that they never felt that Lee was not being forthright with them concerning his upbringing and that his statements to them were consistent with the information gleaned

---

[1] After quoting extensively from the Southern Center's manual and noting the presence in counsel's files of a document entitled "Life History Checklist" that "echoed" much of the manual's information, the habeas court found that counsel failed to follow the "guidance and instruction" contained in those documents. While it is appropriate to measure counsel's performance against prevailing norms of practice as reflected in publications such as the Southern Center's manual, as well as American Bar Association standards like the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, we remind habeas courts that such publications "are *only guides*" in determining the reasonableness of counsel's performance, as no set of rules can adequately allow for "the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." (Emphasis supplied.) *Strickland v. Washington*, supra, 466 U. S. at 688, 709. See *Hall v. McPherson*, 284 Ga. 219 (2) (663 SE2d 659) (2008).

from their interviews with Lee's mother and stepfather. According to counsel's testimony and the record, at a minimum counsel also spoke with Lee's elementary school special education teacher, his elementary school principal, his father, his half-sister, his ex-wife,[2] his co-defendant who was also his former girlfriend, his current girlfriend, and his cottage parents at the Florida Sheriffs Boys Ranch where Lee spent two years. In addition, the defense investigator spoke with the unit director, the farm manager, and the family social worker assigned to Lee's case at the Boys Ranch and other "family or family friends" and reported back to counsel. Counsel also obtained Lee's school records from Charlton County and Nassau County, Florida, and his records from the Boys Ranch.

From their investigation, counsel learned that Lee's father had for all practical purposes abandoned Lee and his mother when Lee was a toddler, that Lee was diagnosed as being hyperactive when he was two and a half years old, that he had difficulty throughout his school career, and that, when at the age of fourteen, he was in the sixth grade and still experiencing academic and behavioral problems at home and at school, his mother pursued and eventually gained his admission into the Boys Ranch. Trial counsel also learned that, as a consequence of his being raised by a single mother who was addicted to prescription drugs and living on government assistance, Lee had an impoverished upbringing and suffered some abuse and neglect. However, there is no evidence that counsel discovered any public records that concluded that Lee had been severely abused or neglected.

Trial counsel obtained funds from the trial court to have Lee evaluated for mitigating mental health evidence and hired Dr. Daniel Grant, a psychologist whom Adams had previously retained to assist him on another criminal case. Dr. Grant diagnosed Lee with attention deficit hyperactivity disorder (ADHD). Trial counsel also contacted Pamela Leonard, a mitigation specialist at the Multi-County Public Defender's Office, who suggested to counsel that they hire a social worker to assist them. Counsel testified that Leonard also suggested that they consult with Dr. Grant before retaining a social worker and that, when they did so, Dr. Grant told them that it was not necessary to hire a social worker, as he could "handle the testimony" connecting Lee's diagnosis and his behavior.

*3. Trial counsel's sentencing phase strategy.* The habeas court

---

[2] The habeas court found that trial counsel spoke with Karen Lee, "one of Mr. Lee's father's ex-wives, . . . [who] would not have been able to provide any early life mitigation about Mr. Lee." However, our review of the record shows that Karen Lee was actually Lee's ex-wife and that, according to trial counsel's notes, she provided a limited amount of mitigating information regarding Lee's childhood.

found that counsel's sentencing phase strategy was to "present mitigating evidence regarding Mr. Lee's upbringing, mental health, and other circumstances Mr. Lee had 'no control over.' " However, our review of the trial transcript and the habeas record shows that counsel's mitigation strategy was more focused than the habeas court found. Lee admitted to police after being taken into custody that he killed his father's girlfriend and stole his father's truck, and he offered as a reason for his crimes that he wanted to get back at his father because his father had abandoned Lee and his mother. Based on the information trial counsel possessed regarding Lee's life history and because of Lee's statements about the crimes, counsel developed a mitigation strategy that revolved around the following: showing that Lee, who was 19 years old at the time of the crimes, was angry with his father for his abandonment of Lee and his mother when Lee was very young and for the chaotic, difficult life that Lee and his mother endured as a result; that Lee had no control over and was a victim of his ADHD, which impacted not only his behavior on the night of the crimes but also led him to make damaging statements to police; and that Lee's history at the Boys Ranch showed that he could succeed in a structured environment, and, thus, that life in prison, not death, was the appropriate sentence for Lee.

Contrary to the habeas court's order, the record does not support a finding that Adams testified that, had he and Brooks known of the severity of the abuse that Lee suffered as a child that was presented in the habeas proceeding, they would have presented it. Adams testified that he and Brooks "felt [they] had the best witnesses [they] could get," that they would not have presented the affidavit testimony of family and friends presented in the habeas proceeding, that the jury would have known the people from the area that gave those affidavits to Lee's habeas counsel, and that, for the most part, the affiants were not the type of people that counsel wanted to place in front of a jury.

Adams also testified that he and Brooks had the advantage of "being able to look at a jury that some of whom were [their] clients, or people that [they'd] known for years." He explained that, because he and Brooks did not think a "Charlton County jury was going to be particularly receptive to trying to blame this shooting on the boy's mother," he and Brooks decided as a matter of strategy against defending Lee by "trashing his mother," although they were aware of incidents of physical abuse of Lee by his mother, such as slapping him and pulling his hair. Adams testified that they, instead, strategically decided to focus on Lee's father's abandonment and Lee's ADHD, because that strategy "seemed to dovetail perfectly" with Lee's statements to police that the motivation behind the crimes was getting at his father and with the fact that Lee had made threatening

statements counsel considered merely bravado. The habeas court relied on Adams' statement that, "had [counsel] known that [Lee's mother] . . . physically abused [him] like beating him up, or cutting him, or something like that, [they] may have placed that into evidence, certainly." However, when that statement is considered in context with the remainder of Adams' testimony, it is apparent that Adams meant that they would have presented evidence of atrocious abuse of Lee had they been aware of it. Adams' testimony, taken as a whole, shows that he considered the abuse presented in the habeas proceeding, like the abuse that counsel were aware of pre-trial, not to be so shockingly brutal that it would have led them to change their strategy.

The habeas court found that trial counsel acted unreasonably in ignoring indications in documents that were in counsel's possession that should have alerted them that the physical abuse and neglect in Lee's childhood were more severe than counsel believed. The habeas court cited two documents, an evaluation of Lee conducted by a social worker upon referral by Lee's kindergarten teacher (the school evaluation) and the State's mental evaluation of Lee completed one week before Lee's trial (the State evaluation), that it found should have caused counsel to further investigate Lee's childhood.

While the social worker who prepared the school evaluation reported that Lee's mother admitted to having a drinking problem, additional school records contained much positive information about her. The records noted that Lee's mother seemed to love Lee and to be concerned for his welfare; that from infancy she had been concerned about his behavior; that she entered Lee into a program at the Charlton County Training Center just prior to his entering kindergarten because she reasoned that he "needed an opportunity to be with other children"; that she stated that she had never berated Lee's father in front of Lee, because she did not want Lee to grow up hating his father; that she bought Lee a dog to provide him companionship; that throughout Lee's school career she regularly attended Individual Education Program (I.E.P.) conferences to review and approve Lee's special education curriculum; and that, when she was unable to attend the conferences, she made other arrangements, including requesting conferences at her home when she lacked transportation. The school evaluation also contained incidents of Lee's behavior that demonstrated his extreme hyperactivity at a young age; however, school records reported that Lee's mother had sought out and maintained psychiatric care for Lee from the time he was two and a half years old until the attending psychiatrist released him at the age of seven years. While the social worker visiting Lee's grandparents' home noted in the school evaluation that the home was "a mess" and had a foul odor, she also stated that

Lee's mother explained that she had been in bed for four days and apologized for the home's condition. The school records contained no other comments regarding the poor condition of Lee's home, although it appears that at least some I.E.P. conferences were held there. The social worker from the Boys Ranch who visited Lee's home in Florida noted that it was "fairly new" and was "well-maintained outside and inside." Although in the school evaluation the social worker described Lee as having a severe case of dental caries, a dirty face, and being "sloppily dressed," a school psychometrist who evaluated Lee during kindergarten noted that he was "neatly dressed and well groomed," "appeared to be socially confident," was "comfortable" in adult company, and "displayed good social skills" and that he stated that he enjoyed playing games with his mother and grandparents at home.[3]

The State evaluation reported that Lee gave a history of physical and emotional abuse by both his parents, that his mother's substance abuse prevented her from providing the nurturing care required for a child's upbringing, and that Lee described his mother as being at times unable to function, often out of control, and physically abusive to him by slapping him, pulling his hair, and throwing him out of the house on several occasions. The report concluded that "[i]ndependent verification of these experiences would be valuable as far as documentation of childhood trauma and the effect which this can have on his subsequent emotional development" and that these factors could be considered mitigating. Adams was present during the State's evaluation of Lee and, thus, heard Lee's descriptions of childhood abuse and neglect referenced in the State evaluation. Adams testified in the habeas evidentiary hearing that he was aware of the incidents of physical abuse by Lee's mother that Lee reported to the State psychologist, and that, after discussing with Dr. Grant the State evaluation, which concurred with Dr. Grant's diagnosis of Lee as suffering from ADHD, he and Brooks decided to remain with their original mitigation strategy of focusing on Lee's ADHD and his father's abandonment in presenting their mitigation case. This was not an unreasonable decision. See *Chandler v. United States*, 218 F3d 1305, 1314 (XI) (11th Cir. 2000) (en banc) ("Good advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others."). By that point,

---

[3] We note that some of this information is contrary to that alleged in the affidavit testimony that the habeas court found credible. However, we do not consider this information to establish the truth of the matters asserted but as an indication of the information known to defense counsel at the time they made their decision regarding mitigation strategy. Compare *Waldrip v. Head*, 279 Ga. 826 (II) (A) (620 SE2d 829) (2005) (refusing to consider inadmissible hearsay on appeal despite the absence of any objection).

counsel had reviewed and provided Lee's school records to Dr. Grant. Dr. Grant testified at trial that he reviewed Lee's school records and that, based on those records and his interviews with Lee, he considered Lee's father's abandonment to have had the most significant negative impact on him. Our review of Lee's school and Boys Ranch records shows that, from kindergarten onward, Lee's relationship with his father was considered to be a significant contributor to Lee's problems.

Trial counsel reasonably relied on the information that Lee provided to them that his childhood history of abuse and neglect was not constant and severe, particularly in light of the evidence reported by the family members counsel spoke with and contained in the records in counsel's possession. See *Strickland v. Washington*, supra, 466 U. S. at 691 (stating that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements"). Thus, we conclude as a matter of law that counsel, as "longtime local lawyers who knew their community," acted reasonably in strategically choosing not to focus on Lee's mother's shortcomings at trial based on the information they possessed. *Rogers v. Zant*, 13 F3d 384, 387 (11th Cir. 1994). See *Waters v. Thomas*, 46 F3d 1506, 1522 (II) (E) (11th Cir. 1995) (en banc) (stating that "counsel's knowledge of local attitudes" and evaluation of the jury are intangible factors that are considered by most effective counsel in making decisions). See also *Turpin v. Mobley*, 269 Ga. 635 (3) (D) (502 SE2d 458) (1998) (whether an attorney's trial tactics are reasonable is a question of law, not fact).

The habeas court found, however, that counsel's decision not to introduce specific incidents of Lee's childhood history of abuse and neglect and his mother's substance abuse was not supported by a sufficient investigation. We need not determine whether counsel's investigation into mitigating evidence in Lee's case constituted deficient performance under the first prong of *Strickland*, because, even assuming the habeas court correctly concluded that counsel's failure to investigate and present the habeas testimony of Lee's childhood history of abuse and neglect constituted deficient performance, we conclude as a matter of law that Lee has not shown prejudice sufficient to warrant success of his overall ineffective assistance of counsel claim. See *Strickland v. Washington*, supra, 466 U. S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."). See also *Schofield v. Holsey*, 281 Ga. 809 (II), n. 1 (642 SE2d 56) (2007) (holding that the combined effect of trial counsel's various professional deficiencies should be considered).

*4. Actual prejudice.* To determine prejudice in the sentencing phase of a case challenging a death sentence, "the question is

whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland v. Washington*, supra, 466 U. S. at 695. In conducting this review, this Court must "reweigh the evidence in aggravation against the totality of available mitigating evidence," *Wiggins v. Smith*, supra, 539 U. S. at 534, being mindful that a verdict "with overwhelming record support" is less likely to have been affected by errors than one "only weakly supported" by the record. *Strickland v. Washington*, supra, 466 U. S. at 696.

*a. The mitigating evidence presented at trial.* We first review the mitigation evidence trial counsel actually presented. Lee's counsel supported their mitigation theory by first presenting the testimony of Lee's former teacher, who testified that, after being referred and tested, Lee was placed in her severely emotionally disturbed class at age seven, where he remained for three years; that he was on Ritalin for his hyperactivity but still was very impulsive and unable to maintain attention, keep a seat, or wait his turn to speak; that he suffered from some basic security problems and followed behind her in the classroom; that Lee's home was usually in disarray during her monthly home visits; that Lee's mother did not respond to suggestions that she get Lee involved in after-school activities and did not provide an authority figure for Lee; and that, after Lee was transitioned out of her classroom, he continued to receive help in a specific learning or brain disabilities class.

Counsel then presented the testimony of Lee's parents to inform the jury of the instability, poverty, violence, abandonment, and alcohol and drug use that Lee was exposed to as a child. Lee's natural father testified that he had been married to seven women and had six children, some of whom were born out of wedlock; that about the time of Lee's birth he had an affair that produced a child; that he and Lee's mother "did a lot of drinking" and had violent fights; that Lee's mother used a lot of marijuana; that he never paid child support for Lee and seldom saw him after he and Lee's mother separated when Lee was a toddler; that he had been "a bad father" to Lee; and that he did not know Lee well enough to name one redeeming quality that Lee possessed that made his life worth saving. Lee's mother likewise testified that Lee's father was never a real father to Lee; that he abandoned her and Lee physically and financially by the time that Lee reached three years of age, which required them to survive on government assistance; and that she was not always able to meet Lee's physical needs. She also testified that she and Lee spent most of Lee's preschool years living with her parents; that, when Lee was five years old, she left him with her parents and moved to Florida with her boyfriend for a year and a half

before bringing Lee to live with them; that, after six months, she and Lee moved back to Charlton County; and that they returned to Florida after she married Lee's stepfather. She acknowledged that she frequently took Demerol while she was pregnant with Lee and that for years she had had an "ongoing battle" with taking prescription drugs, intimating that it had affected her ability to be a good mother to Lee. She testified that Lee had always been extremely hyperactive; that he was placed on Ritalin before he was three years old; that as a child Lee could not sit still, could not concentrate, barked like a dog[4] rather than talked, and rocked incessantly; that she ceased giving Lee Ritalin at age seven because it caused him to be even more active; that, although she did not know how to handle Lee's hyperactivity, she tried to deal with it on her own from the time Lee was seven to thirteen years of age when she began the process of gaining his admission to the Boys Ranch; that, while Lee did well at the Ranch, when he returned home at age seventeen, he did not go to school and could not keep a job; and that he soon moved out of the home and did not return there to live.

Lee's stepfather testified that he had served 12 years in prison for a murder committed during an armed robbery when he was 17, that he had never been in any trouble since that time and now ran his own farm, that he and Lee had a good relationship, and that Lee was close to and helped care for his baby brother. Counsel testified that they hoped this testimony would convince the jury that, like his stepfather, Lee could be rehabilitated and become a responsible member of society.

Lee's former house mother at the Boys Ranch testified that the Ranch did not accept boys into the program who had been "in lock-up" but only those who were referred by local sheriffs' departments; that referrals could be for abuse in the home and that Lee was referred because of problems at home and at school; that, as part of the Ranch's structured environment, Lee had household chores and farm work to complete; and that he did well both in school and in the cottage home and was selected by the staff to receive the Ranch's most prestigious award. She became emotional when she testified that Lee had repeatedly told her that she was more like a mother to him than anyone, that she thought that Lee's problems

---

[4] Lee's habeas counsel submitted a great deal of affidavit testimony about Lee's dog-like behavior when he was young, including the averment that he ate dog food. The habeas order refers to this as one of Lee's most "bizarre" behaviors. However, Dr. Catherine Boyer, one of Lee's habeas mental health experts, testified that she asked Lee about this behavior and that he stated that "[his] best friend was [his] dog," that he would "crawl under the house to be with her," and that he did not have to eat dog food but only tasted it out of curiosity about what it tasted like.

with authority and anger stemmed from his home life, that he was angry with his father for abandoning him and angry with his mother for rejecting him "for her boyfriend or her husband," and that Lee had talked with her about his mother's drug and alcohol use. She also testified that Lee was loving and caring; that she never feared him; that his outbursts of anger were followed by tears and apologies; that she still saw "good" in him; that he still called her "Mom" and her husband "Pop," and that he had last visited them shortly before the crimes. Her testimony showed that she was close to Lee at the time of the crimes, that, while she was aware of his shortcomings, she believed that they were largely due to his background, and that she considered his life worth saving because his time at the Boys Ranch demonstrated that he thrived in a structured environment.

Finally, trial counsel presented Dr. Grant to show how Lee's ADHD affected his behavior on the night of the crimes and to explain threats he had made in statements to police. Dr. Grant testified that, after spending approximately 18 hours with Lee, reviewing Lee's school records from kindergarten through seventh grade, and conducting extensive testing of Lee, he concluded that Lee's IQ fell within the low average range, that Lee "fit[ ] within the diagnostic category of attention deficit disorder with hyperactivity, and substance abuse," and that he agreed with the State's mental evaluation of Lee. Dr. Grant opined that the environment in which Lee grew up exacerbated his problems, because, "starting very early in life, there was deprivation at times, where there wasn't even adequate food in the home"; that, in addition, there was "the abandonment by the father, . . . a lot of abuse, frequent changing [of] and inconsistent rules and caregivers"; that Lee's mother "had a problem with substance abuse"; that she "was inconsistent in her behavior"; and that "there was some physical abuse as well as neglect." Dr. Grant explained that Lee was born with ADHD; that he had received no treatment for it since he was seven years old; that roughly half of the individuals who exhibit ADHD symptoms as an adult will also develop other psychopathology, especially if they are not receiving treatment; that Lee should have continued in treatment, as ninety percent of ADHD sufferers respond well to treatment; and that the treatment of choice for the disorder was a structured environment. Dr. Grant also testified that he had recently completed 15 years of working in the prison system, and he described the structured routine of a prisoner's life.

The habeas court found that Dr. Grant's diagnosis allowed the State to credibly argue to the jury that ADHD afflicts "millions of children"; however, Dr. Grant explained at trial that, while ADHD affects about three to five percent of children in the general population, only one and a half to three percent of the population still

exhibits symptoms as an adult, as Lee did. He also testified that, in cases where an individual experiences trauma, as Lee had, and is diagnosed with ADHD as early as Lee was, the disorder is more severe, more resistant to control, and more likely to continue into adulthood and that those individuals are likely to exhibit more severe symptoms in adulthood than individuals who have onset later in life. Dr. Grant testified that adults with the disorder are impulsive and overly active, that they have problems with planning and organization, and that "one of the core issues of the hyperactive individual is the fact of the difficulty regulating and controlling [emotions and] behavior." As previously noted, Dr. Grant also opined that the most significant impact on Lee's life was his father's abandonment of him, especially in light of the fact that his father had other children with whom he was very involved, and that Lee's ADHD was aggravated by his feelings of anger, frustration, resentment, and abandonment. To counter the State's argument that death was the appropriate sentence for Lee because of his future dangerousness, as evidenced by threatening statements he had made to police, Dr. Grant explained that adult ADHD sufferers commonly engage in lying or boasting to "project an image of toughness or bravado," and he opined that Lee did so in order to mask his fears of abandonment and rejection. He also testified that Lee did not seem mean, malicious, or aggressive and that, while Lee's ADHD did not excuse his crimes, it was "a major part of his personality."

*b. The mitigating evidence presented in the habeas proceeding.* In reviewing the affidavit testimony that Lee presented in the habeas proceeding, we note that much of it consists of hearsay and speculation that would not have been admissible at trial. See *Smith v. State*, 270 Ga. 240 (12) (510 SE2d 1) (1998) (holding that the hearsay rule is not suspended in the sentencing phase), overruled on other grounds by *O'Kelley v. State*, 284 Ga. 758 (3) (670 SE2d 388) (2008). The habeas court properly sustained the Warden's objections to much of this testimony. See *Whatley v. Terry*, 284 Ga. 555 (V) (A), n. 29 (668 SE2d 651) (2008) (urging habeas courts to make detailed rulings on admissibility where affidavits are submitted as evidence and where such affidavits are relied upon by expert witnesses in forming their opinions). However, in some instances, the habeas court cited and relied upon testimony it had previously ruled inadmissible to support its findings.[5] Affidavit testimony regarding

---

[5] For instance, the habeas court granted the Warden's objection to affidavit testimony concerning Lee's mother's reputation in the community on the ground that it was based on inadmissible hearsay, yet the habeas court relied on the testimony it previously ruled inadmissible to find that trial counsel failed to present evidence that Lee's mother "developed a reputation as a 'pill junkie.' "

the "addiction, dysfunction, and brutality that spanned multiple generations" of Lee's family that occurred before Lee's birth or did not directly affect Lee would not have been significantly mitigating. See id. at 566 (noting that affidavits submitted by a habeas petitioner concerned things that affected his family members rather than him).

Our review shows that much of the relevant and admissible affidavit testimony concerning Lee's childhood history of abuse and neglect is similar to what counsel testified that they were aware of pre-trial. While some affiants described Lee's mother as generally beating Lee, more often her treatment of Lee was stated in terms of her having slapped him, punched him, or pulled him by his hair. One affiant did testify that she saw Lee's mother hit him with a belt, knock him down, and kick him in the head and that Lee's mother often behaved this way. However, the remaining specific instances of physical abuse contained in the affidavit testimony that were witnessed firsthand are as follows: (1) that, when Lee was two years old, he dropped a coffee cup, which resulted in Lee's mother's shouting obscenities at him and smacking him hard across the face, leaving a mark; (2) that, when he was about four years old, his mother "clenched her fist and gave [Lee] a backhand right in the mouth," causing his head to hit the terrazzo floor and his mouth to bleed; (3) that, at six years of age, she hit Lee across the face, leaving a "big red hand print"; and (4) that, when he was nine years old, she beat Lee in the chest and pulled his hair. There is also testimony that Lee's mother called Lee obscene names, that she never said nice things about him or showed him affection, and that she begged others for diet or pain pills, exchanged sexual favors for drugs, and sold pills to earn money to buy more drugs. Both Lee's grandparents' home and the apartment where Lee lived as a child with his mother are described as "reek[ing]" of marijuana and cigarette smoke and as being roach-infested, cluttered, and filthy, and Lee is described as being constantly dirty and hungry and frequently having head lice as a child. Lee's father and mother testified in their affidavits that they fought violently in Lee's presence.[6] While there is affidavit testimony that Lee's grandfather drank heavily and his grandmother took Valium, there is no testimony that either of Lee's grandparents mistreated him.

The additional evidence presented in the habeas court is disturbing and certainly shows that Lee came from a dysfunctional family. However, particularly in light of the mitigating evidence that the jury did hear, this additional testimony fails to establish that Lee's

---

[6] We note that Lee's father indicated at trial that he had struck Lee's mother; however, he testified that he did not "remember" doing so in front of Lee.

childhood was so harmful or horrific as to create a reasonable probability that it would " 'have influenced the jury's appraisal' of [Lee's] moral culpability. [Cit.]" *Wiggins v. Smith*, supra, 539 U. S. at 538 (finding prejudice where counsel unreasonably failed to present mitigating evidence that the petitioner's mother left the petitioner and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage; that she beat the petitioner for breaking into the kitchen, which she kept locked; that she forced his hand against a hot burner, for which he was hospitalized; that she had sex with men while he slept in the same bed; and that the petitioner was placed in foster care at age six, during which he suffered physical torment, sexual molestation, and repeated rape). See *Hall v. McPherson*, 284 Ga. 219 (2), 223-226 (663 SE2d 659) (2008) (finding prejudice where counsel failed to present mitigating evidence that the petitioner was beaten with two belts wrapped together, went shoeless in cold weather, rummaged through dumpsters, roamed the street at 3:00 a.m., slept in abandoned cars because he was not allowed home on weekends, and was removed from the home, placed in State custody, and spent his youth in foster homes, detention centers, and group homes).

*c. The strength of the State's case against Lee and the evidence in aggravation.* The mitigation evidence Lee's habeas counsel has presented is less compelling when considered in light of the strength of the State's case, including Lee's incriminating statements to his companions and to the police. The evidence presented at trial also showed that, when Lee was stopped by a highway patrolman after the murder, he placed a cocked, loaded gun that he had stolen in his companion's lap and told the companion to get out and "shoot the cop" while he "cover[ed]" the companion with another stolen, loaded gun. In addition, the habeas court based its determination that Lee was prejudiced in part on its conclusion that Lee did not plan to kill Chancey. However, the evidence presented at trial authorized the jury to find that "Lee and his girl friend decided to drive to Pierce County to kill Lee's father and steal his father's Chevrolet Silverado pickup truck" and that, "[w]hen Lee learned that his father was not home, he decided to kill . . . Chancey." *Lee v. State*, supra, 270 Ga. at 799.

The jury also found the presence of four statutory aggravating circumstances,[7] and the evidence at trial showed that Lee threw

---

[7] The jury found that Lee committed the murder while engaged in the commission of armed robbery and kidnapping with bodily injury, that he committed the murder for himself or another for the purpose of receiving money or any other thing of monetary value, and that the offense of murder was outrageously or wantonly vile, horrible, or inhuman in that it involved an aggravated battery to the victim before death. OCGA § 17-10-30 (b) (2), (4), (7).

Chancey, wounded and bleeding, into the back of the Silverado, drove her for about an hour to a secluded area, dragged her out of the truck bed and "quite a distance from the road," and shot her two more times while removing her jewelry. The non-statutory aggravating evidence the State presented at trial included the testimony that Lee was on probation at the time of the crimes for two counts of burglary and for theft by taking for stealing a truck; that Lee had violated his probation and had stolen a car and viciously beaten a man because he "wanted to see blood, a lot of blood"; that, 15 months after the crimes while awaiting trial, Lee, acting alone, escaped from jail, stole a vehicle, and fled to Florida; and that, upon his recapture, he made several threatening statements to police, including that he still wanted to kill his father and that, if he were ever given the opportunity, he swore that he would kill the detective and the GBI agent assigned to his case. Compare *Williams v. Allen*, 542 F3d 1326, 1343 (II) (A) (2) (11th Cir. 2008) (noting that the fact that the case was not highly aggravated "[f]urther support[ed] a finding of prejudice"). All things considered, we conclude that there is no reasonable probability that Lee would have received a different sentence had the jury heard the additional life history mitigation evidence that he submitted in his habeas proceeding.

*C. Failure to Present Psychiatric Mitigating Evidence as Presented in the Habeas Proceeding*

The habeas court found that trial counsel's failure to discover and present to Dr. Grant Lee's life history as set out in the affidavit testimony discussed above and the records from the Charlton County Training Center, which Lee attended during the summer prior to entering kindergarten, led to Dr. Grant's incomplete diagnosis of Lee. The habeas court found that the fact that Lee was mistakenly diagnosed as mentally retarded while at the Training Center would have demonstrated the negative impact of his deprived environment and provided Lee's mental health expert with the information to support a theory that Lee "was less culpable as the result of his childhood and impairments." However, our review of the record shows that trial counsel actually did obtain and submit to Dr. Grant as a part of Lee's school records an evaluation of Lee performed in kindergarten that contained the information that Lee's classification of functioning had been in "the Mild level of Mental Retardation" according to previous results of a test administered at the Training Center. Dr. Grant indicated during his testimony at trial that he found this kindergarten evaluation "significant." Thus, we conclude that Lee was not prejudiced by trial counsel's failure to obtain the Charlton County Training Center records.

As to the affidavit testimony, Dr. Grant testified in the habeas court that had he possessed the additional information that the

affidavits provided, he would have diagnosed Lee as also suffering from post-traumatic stress disorder (PTSD), would have testified to that diagnosis, and also would have testified to and explained how the chaos, neglect, and abuse in Lee's life "had a clear nexus to the crimes in this case." However, Dr. Grant did not explain how Lee's PTSD was related to the murder. Although he noted "the vague flashbacks that [Lee] recalled during [his] interview with him," Dr. Grant did not claim that, at the time of the murder, Lee was experiencing a flashback or was in a disassociative state as a result of his PTSD.

In order to show that "a mental health expert who was fully informed" of Lee's background could have provided the jury with an explanation of how Lee's mental impairments related to the murder, the habeas court quoted extensively from the affidavit of another psychologist retained by Lee's habeas counsel, Dr. Catherine Boyer. However, "the critical issue" in a case such as this is what the expert consulted at the time of trial "would have been willing to testify to had [that expert] been provided the materials trial counsel allegedly failed to provide." *Schofield v. Holsey*, supra, 281 Ga. at 813.

Further, contrary to the implication in the habeas court's order that Dr. Boyer also diagnosed Lee with PTSD, Dr. Boyer made no diagnosis of Lee's mental condition at the time of her interview or at the time of the crimes and, in fact, conducted no psychological testing of Lee. Rather, she testified that, while PTSD "would be a very reasonable diagnosis" of Lee's mental condition at the time of the crimes based upon her interview with Lee and her review of the affidavits, the records Dr. Grant reviewed, and the pre-trial testing of Lee that Dr. Grant performed, she could not make a diagnosis of Lee's pre-trial mental condition, because she did not see Lee at that time. In that portion of her affidavit testimony relied upon by the habeas court to connect Lee's "mental impairments" or "significant emotional problems" with the crimes, Dr. Boyer testified that Lee's "impaired impulse control, impaired emotional control, high levels of distress, and inability to structure or stabilize his own life" made him "particularly vulnerable to involvement in the murder." Even assuming it were proper to allow her testimony connecting Lee's undiagnosed "mental impairments" or "emotional problems" with the crimes to substitute for testimony connecting Dr. Grant's new diagnosis of PTSD and the crimes, we do not find that portion of her testimony significantly different from Dr. Grant's trial testimony regarding the effects of Lee's environment and ADHD upon him that are discussed above.

Lee argues that a diagnosis of PTSD is more compelling than a diagnosis of ADHD, because PTSD is an Axis I diagnosis and this Court has found ineffective assistance of counsel where trial counsel

failed at the sentencing phase of a death penalty trial to present evidence of another Axis I diagnosis, major depression. See *Hall v. McPherson*, supra, 284 Ga. at 235. However, in determining prejudice, this Court evaluates the totality of the evidence — "both that adduced at trial, and the evidence adduced in the habeas proceeding[.]" *Williams v. Taylor*, supra, 529 U. S. at 397. Here, Lee's trial expert failed to connect his new diagnosis of PTSD to the crimes, and the connection that his habeas expert made between his undiagnosed "mental impairments" and the crimes is similar to the connection his trial expert made between his diagnosis of ADHD and the crimes. Thus, there is no reasonable probability that a jury confronted with the psychiatric mitigating evidence as presented in Lee's habeas proceeding, including Dr. Grant's new diagnosis of PTSD, would have returned a different sentence. Compare *Hall v. McPherson*, supra, 284 Ga. at 234-235 (finding prejudice where counsel failed to present evidence of defendant's childhood abuse and neglect by his mother, his early exposure to alcohol and drugs, and readily available expert psychiatric testimony explaining how that background led to his major depression, where the only argument by the State in favor of a death sentence was that the defendant chose his life of drug addiction, although others, particularly his mother, had tried to help him).

*D. Alleged Failure to Investigate and Present the Relationship between Lee's Mental Impairments and the Crimes*

The habeas court found trial counsel were deficient in failing to investigate and present the relationship between Lee's mental impairments and the crimes. However, as the foregoing discussion shows, trial counsel investigated and presented evidence of that relationship. Thus, the habeas court erred in finding otherwise. Moreover, as discussed above, we conclude as a matter of law that, had trial counsel presented the evidence connecting Lee's mental impairments to the crimes that he presented in his habeas proceeding, there is no reasonable probability that it would have resulted in a different sentence.

*E. Failure to Present Evidence of Lee's Life Leading Up to the Crimes*

The habeas court found that trial counsel unreasonably failed to present evidence to rebut the State's evidence in aggravation that Lee had been involved in criminal activity during the time period after he left the Boys Ranch up to the time of the crimes. We do not agree with the habeas court's finding that the affidavit testimony of Rick Pope and Brenda Morgan, who testified that Lee worked for their cleaning services for a short time after he left the Boys Ranch, would have undermined the State's theory that Lee adopted a violent life of crime after he left the Boys Ranch or the habeas court's

finding that such testimony would have been mitigating because it would have portrayed a sympathetic picture of Lee as homeless and unemployed at the time of the crimes. Their testimony shows that, if Lee was homeless and unemployed at the time of the crimes, it was his choice. Both Pope and Morgan testified that they offered their homes to Lee as a place to live and treated him like a member of the family, that they provided him with employment that he was capable of performing well, and that Lee chose to leave their homes and their employment after a few months. Pope testified that, after Lee left, he would return periodically in order to earn a little money and would then leave again; that he "sensed a change in [Lee]"; and that, when he tried to talk to Lee about the crowd he was associating with and to warn him "that he would wind up in jail or in prison by the time he was 21 if he continued to go down that road," Lee told him that his new friends made him happy.

Nor do we agree with the habeas court's finding that trial counsel were deficient for not eliciting from Lee's mother at the sentencing phase testimony showing that, shortly before the crimes, she refused Lee's request for financial help and referred him to his father because he had been "living the high life all these years. . . ."[8] Not only has Lee failed to show that he or his mother informed trial counsel of this information, but this testimony would not have been particularly mitigating considering there was no evidence that Lee attempted to ask or even considered asking his father for financial help before killing Chancey and taking his father's truck. Had counsel presented this evidence at trial, the State would likely have argued that Lee's father may have assisted him if Lee had asked, as the evidence showed that Lee's father had provided Lee's bail to secure his release from jail when he was incarcerated on other charges prior to the murder and had provided a home for him for months after his release. Moreover, Lee chose against counsel's advice to testify at the sentencing phase. The affidavit testimony Lee presented would not have significantly mitigated the State's argument that he had chosen a violent criminal path in light of the fact that, on cross-examination, he testified that shortly before the murder he stole six guns, including the one with which he killed Chancey, in order to defend himself from the police from whom he "was on the run" at the time.

*F. Failure to Introduce Records*

We also conclude that Lee did not suffer constitutionally signifi-

---

[8] We note that the habeas court relied on affidavit testimony it previously ruled inadmissible as hearsay to find that Lee's mother also told him at the time that his father's Silverado was his "child support."

cant prejudice from his trial counsel's failure to introduce the State's mental health evaluation of Lee, the Charlton County school evaluation, and portions of Lee's school records at the sentencing phase,[9] because Dr. Grant, Lee's mother, and his former teacher provided testimony regarding his mental impairments, deprivation, and abuse. In addition, the State evaluation noted that Lee reported that he was asked to leave the Boys Ranch because of his behavior in school. This information would have undermined counsel's mitigation strategy to show that Lee succeeded at the Boys Ranch and, thus, would do well in the structured environment of a prison, and it also likely would have undermined the credibility of Lee's cottage mother, whom counsel testified, and our review of the trial transcript shows, was a strong mitigation witness for Lee. Further, the information contained in these documents is no more atrocious or adverse than that contained in the affidavit testimony, and, as discussed above, the omission of that testimony did not prejudice Lee.

### G. Combined Effect of Individual Ineffective Assistance Claims

Considering the combined effect of the deficiencies assumed in the discussion above, we conclude that those deficiencies would not in all reasonable probability have changed the outcome of the sentencing phase of Lee's trial. See *Schofield v. Holsey*, supra, 281 Ga. at 811, n. 1 (holding that the combined effect of trial counsel's errors should be considered).

### Case No. S09X1345

### III. Proportionality of Lee's Sentence

Lee contends in his cross-appeal that the habeas court erred in denying his claim that his death sentence was disproportionate and that it was imposed arbitrarily and capriciously because the way in which this Court conducts its proportionality review is unconstitutional and violates Georgia statutory requirements. The habeas court correctly found that portion of Lee's claim "wherein he assert[ed] his death sentence [wa]s disproportionate" was res judicata. See *Lee v. State*, supra, 270 Ga. at 804. "[W]e perceive no reason to re-examine the issue [of the proportionality of Lee's death sentence]." *Schofield v. Meders*, 280 Ga. 865, 871 (8) (632 SE2d 369) (2006) (declining to re-examine proportionality on habeas corpus). See *Davis v. Turpin*, 273 Ga. 244 (2) (539 SE2d 129) (2000) (same).

The habeas court did not rule on the remaining portion of Lee's claim. However, as a review of the record shows that Lee failed to

---

[9] We offer no opinion as to the admissibility of these documents. See *Smith v. State*, supra, 270 Ga. at 249 (holding that the hearsay rule is not suspended in the sentencing phase).

assert in his original petition, his amended petition, or his post-hearing brief a constitutional or statutory challenge to this Court's method of proportionality review as provided in OCGA § 17-10-35 (c), it is waived. See *Harris v. State*, 114 Ga. 436, 438 (40 SE 315) (1901) (holding that a question that is not raised or passed upon in the lower court cannot be considered by a reviewing court). See also OCGA § 9-14-44 (stating that the contents of a habeas petition must "clearly set forth the respects in which the petitioner's rights were violated"). Even assuming this claim were not waived, "the method by which this Court conducts its proportionality review satisfies Georgia statutory requirements and is not unconstitutional." *Davis v. Turpin*, supra, 273 Ga. at 245 (2). See *Gissendaner v. State*, 272 Ga. 704 (16) (532 SE2d 677) (2000).

Accordingly, we order Lee's death sentence reinstated.

*Judgment affirmed in Case No. S09X1345 and reversed in Case No. S09A1344. All the Justices concur.*

DECIDED NOVEMBER 2, 2009.

*Thurbert E. Baker, Attorney General, Sabrina D. Graham, Assistant Attorney General*, for appellant.

*Thomas H. Dunn, Brian Kammer, Lynn M. Damiano*, for appellee.